637 F.2d 1255
 Donna Sue RUSSELL, a widow; Gary Robert Russell and Kirsten
Hope Russell, minors, by their Guardian, Donna Sue
Russell, Petitioners,
v.
LAW ENFORCEMENT ASSISTANCE ADMINISTRATION, United States
Department of Justice, Respondent.
 No. 78-2437.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Feb. 4, 1980.
 Decided Oct. 31, 1980.
 
 Michael Korn, Korn & Marblestone, Sherman Oaks, Cal., for petitioners.
 Howard Gest, Asst. U.S. Atty., Los Angeles, Cal., for respondent.
 Petition for Review of a Final Action of the Law Enforcement Assistance Administration, United States Department of Justice.
 Before TRASK and FLETCHER, Circuit Judges, and SOLOMON,* District Judge.
 FLETCHER, Circuit Judge:
 
 
 1
 The petitioner, for herself and her minor children, petitions for review of the denial of her application for benefits under the Public Safety Officers Death Benefits Act, 42 U.S.C. §§ 3796-3796c (1976) (Benefits Act). The benefits were sought on account of her police sergeant husband's death in the line of duty. We take jurisdiction under 42 U.S.C. §§ 3758(a), 3759 (1976), and reverse.
 
 
 2
 * FACTS
 
 
 3
 Sergeant Edward Russell worked as a detective for the Los Angeles County Sheriff's Department. He was required to bring his own car to work and used it extensively during investigations.
 
 
 4
 On January 15, 1977, he was working as the weekend duty detective, handling custodial cases and responding to emergency investigative needs. He reported to work at 8:00 a. m., worked on investigations at the station and in the field all day, and left for home at 11:00 p. m. At about 11:45, his car was forced out of its lane by an errant auto, colliding head-on with an oncoming car. Russell was killed.
 
 
 5
 Russell's wife and children received county employee death benefits and state workers' compensation payments. Mrs. Russell then applied for payments under the Benefits Act, which provides a death benefit of $50,000 to the dependents of a police officer who dies from an injury sustained "in the line of duty." The Law Enforcement Assistance Administration (LEAA), which administers the Benefits Act, denied the application on the ground that Sergeant Russell did not die in the line of duty. Mrs. Russell petitions for review of that denial.
 
 II
 JURISDICTION
 
 6
 The threshold question is whether we have jurisdiction to review LEAA denials of applications for Benefits Act payments.
 
 
 7
 The jurisdiction of the United States courts of appeals is limited to that conferred by statute. Young Properties Corp. v. United Equity Corp., 534 F.2d 847, 849-50 (9th Cir.), cert. denied, 429 U.S. 830, 97 S.Ct. 90, 50 L.Ed.2d 94 (1976). We turn to the LEAA statute, chapter 46 of title 42 of the United States Code, to determine whether Congress has directed us to review Benefits Act denials. This examination is a frustrating exercise, because Congress has delivered a set of opaque and conflicting signals. Nevertheless, we must try to ascertain and apply the legislative intent.
 
 A. The Statute
 
 8
 In order to understand the judicial review provisions of the LEAA Act it is necessary to understand the structure of the Act, which comprises chapter 46 of title 42 of the United States Code, 42 U.S.C. §§ 3701-3796c (1976). Chapter 46 has nine subchapters. Subchapter I, section 3711, charters LEAA. Subchapters II-IV, sections 3721-3750d, authorize grants for various state and local law enforcement programs. Subchapter V, sections 3751-3774, establishes the procedural regime; its key provisions are section 3751, authorizing promulgation of rules and regulations, section 3758, authorizing administrative review, and section 3759, authorizing judicial review. Subchapters VI-VII, sections 3781-3795, contain minor technical provisions. Subchapter IX, sections 3796-3796c, is the Benefits Act.
 
 
 9
 Russell contends that jurisdiction is straightforwardly conferred by the judicial review provision, section 3759, which provides in pertinent part:
 
 
 10
 (a) If any applicant or grantee ... is dissatisfied with (LEAA's) final action under section 3757 or section 3758 of this title, such applicant or grantee may, within sixty days after notice of such action, file with the United States court of appeals for the circuit in which such applicant or grantee is located a petition for review of that action.
 
 
 11
 In order to decide whether judicial review is available under this section, we must apply the "throwback" clause and determine whether denial of an application for Benefits Act payments constitutes "final action under section 3757 or section 3758."[1] The answer hinges on our interpretation of section 3758.[2]
 
 
 12
 Section 3758 has three subsections. Subsection (a) precludes review except as "hereafter provided." Subsections (b) and (c) establish the procedure for administrative review of denials of financial and technical assistance grants.
 
 
 13
 The government insists that section 3758 applies only to actions covered by subsections (b) and (c): applications by state and local law enforcement agencies for financial and technical assistance grants. It then characterizes an application for Benefits Act payments not as an "application for a grant" but rather as a "claim for a benefit," which, it contends, is outside the scope of subsections (b) and (c). We disagree.
 
 
 14
 We conclude that subsection 3758(a), read in conjunction with section 3759, authorizes review independent of subsections 3758(b) and (c). Subsection (a) provides:
 
 
 15
 In carrying out the functions vested by this chapter in (LEAA), the determinations, findings, and conclusions of (LEAA) shall be final and conclusive upon all applicants, except as hereafter provided.
 
 
 16
 (emphasis added). Admittedly, this language is susceptible of two interpretations. The government asserts that it precludes judicial review of any LEAA action except to the extent that the action is subject to the administrative review provisions of subsections (b) and (c), thus restricting review to applications for grants. Alternatively, it merely establishes the manner and extent of review of all LEAA final actions, including those under the Benefits Act, limiting review to the manner and extent provided by section 3759.[3] We adopt the latter interpretation.[4]
 
 
 17
 Our conclusion is supported by the recent revision of the LEAA statute contained in the Justice System Improvement Act of 1979, Pub.L.No.96-157, 93 Stat. 1167 (1979) (Revised Act).[5] The Revised Act makes no substantive changes in the judicial review provisions of the LEAA statute or in the Benefits Act, and neither the Revised Act nor its legislative history mentions judicial review of Benefits Act cases. There is, however, a significant reorganization of the relevant provisions. Former subsections 3758(b) and (c), establishing the procedure for administrative review of grant application denials, are now subsections 3783(a) and (b). Former subsection 3758(a), limiting the manner and extent of review, is now an independent section, 3784. Former subsection 3759, providing judicial review, is now section 3785. It authorizes judicial review if "any ... recipient is dissatisfied with a final action with respect to section 3783, 3784, or 3789(c)(2)(G) ..." (emphasis added).[6]B. Legislative History
 
 
 18
 LEAA contends that, to the extent that the statute is ambiguous regarding judicial review of denials of applications for Benefits Act payments, the legislative history reveals that judicial review was not intended. We find the legislative history at best inconclusive. As noted above, the statutory provisions relating to LEAA are all contained in chapter 46 of title 42 of the United States Code, 42 U.S.C. §§ 3701-3796c (1976). Most of chapter 46 was enacted as title I of the Omnibus Crime Control and Safe Streets Act of 1968, Pub.L.No.90-351, 82 Stat. 197 (1968) (Omnibus Act). The Omnibus Act created LEAA and authorized it to provide financial and technical assistance grants to state and local law enforcement agencies. It was rewritten, without substantive change in any of the provisions relevant here, by the Crime Control Act of 1973, Pub.L.No.93-83, 87 Stat. 197 (1973). In 1976, the Benefits Act was added to chapter 46, as subchapter IX. There is little discussion of judicial review in the legislative history of either the Omnibus Act or the Crime Control Act, and judicial review is not mentioned in either the text or the legislative history of the Benefits Act.
 
 
 19
 LEAA insists that because the Omnibus Act and the Benefits Act are substantively different and use different language, Congress would have made explicit an intention to extend the judicial review provisions of the Omnibus Act to Benefits Act cases. It is, however, just as logical to argue that because the Benefits Act was added to chapter 46 and the existing programs in that chapter were all subject to judicial review, Congress would have made explicit an intention to withhold review of Benefits Act cases. Such barren legislative history, susceptible as it is to easy syllogistic manipulation, does not aid our inquiry.
 
 C. Preclusion
 
 20
 Since section 3758(a) precludes judicial review of all LEAA final actions except in the manner and to the extent provided by 42 U.S.C. § 3759, were we to find that a denial of an application for Benefits Act payments was nonreviewable under section 3759, it could not be reviewed at all. Courts have always disfavored such a result, and the Supreme Court has stated that " 'judicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress.' " Morris v. Gressette, 432 U.S. 491, 501, 97 S.Ct. 2411, 2418-2419, 53 L.Ed.2d 506 (1977) (quoting Abbott Laboratories v. Gardner, 387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967)). See also Barlow v. Collins, 397 U.S. 159, 166-67, 90 S.Ct. 832, 837-838, 25 L.Ed.2d 192 (1970); Legal Aid Soc'y of Alameda County v. Brennan, 608 F.2d 1319, 1330-31 (9th Cir. 1979), cert. denied, --- U.S. ----, 100 S.Ct. 3010, 65 L.Ed.2d 1112 (1980); Hahn v. Gottlieb, 430 F.2d 1243, 1249-51 (1st Cir. 1970). In the face of the ambiguity of the LEAA statute and its legislative history, we find no clear expression of an intention to withhold review.
 
 
 21
 Nor do we find present in this case any of the factors on which courts have relied to infer an intention to withhold review. Two considerations are relevant here: (1) the appropriateness and necessity of judicial review and (2) the impact judicial review will have on the agency's ability to carry out its mission. See Hahn v. Gottlieb, 430 F.2d 1243, 1249 (1st Cir. 1970). Regarding the first, Benefits Act cases are well suited to review because there is a clear legal standard to apply: whether a death occurred "in the line of duty." Analysis of the legal issues which arise as LEAA applies this standard is within the special competence of courts, and review is necessary to insure that LEAA correctly interprets and applies the statute.[7] The appropriateness of review is indicated also by the fact that three similar federal programs provide direct review in the courts of appeals: the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 921(c) (1976); the Railroad Unemployment Compensation Act, 45 U.S.C. § 355(f) (1976); and the Railroad Retirement Act, 45 U.S.C. § 231g (1976).[8] The second consideration also brings us down on the side of review. Judicial review of Benefits Act cases will not interfere with agency policymaking. It will simply augment the internal adjudicative process which the agency has devised to handle Benefits Act applications.
 
 
 22
 For the foregoing reasons we conclude Congress has mandated appellate court review of LEAA denials of applications for Benefits Act payments. We are not unmindful that the United States Court of Appeals for the Fourth Circuit has reached the opposite conclusion. Lankford v. Law Enforcement Assistance Administration, 620 F.2d 35 (4th Cir. 1980). We have carefully considered the reasoning underlying that decision, but we are persuaded otherwise.[9]
 
 III
 SCOPE OF COVERAGE
 
 23
 42 U.S.C. § 3796(a) (1976) provides a $50,000 payment to the survivors of any police officer[10] who dies from a personal injury sustained "in the line of duty."[11] Mrs. Russell contends that Sergeant Russell's death in a commuting accident was in the line of duty. She makes two supporting points. First, she argues that the standard for determining whether a death occurred in the line of duty is the same as the standard for determining whether an injury is job-related under workers' compensation law. Second, she argues that under workers' compensation law Sergeant Russell's death was within an exception to the ordinary rule against compensating for injuries sustained while commuting.[12] LEAA contests only the first point. It argues that the standard for determining whether a death occurred in the line of duty is more rigorous than the workers' compensation job-relatedness standard. It does not dispute that Sergeant Russell's death is covered under that standard.
 
 
 24
 In order to ascertain the standard established by the Benefits Act it is necessary to understand the purposes Congress sought to promote by it. Congress was concerned that states and municipalities did not provide adequate death benefits to police officers and their families and that the low level of benefits impeded recruitment efforts and impaired morale.[13] By increasing the level of benefits it sought to remedy these defects and thereby assist in the national fight against crime.
 
 
 25
 The most direct and effective method of compensating for inadequate state and local death benefits would have been adoption of a comprehensive federal police officers' death benefits program compensating the families of every deceased police officer. Congress did not go that far. Constrained by budgetary considerations and by fears that federal assumption of full responsibility for compensating the families of deceased officers would weaken the federal system and allow states and municipalities to evade their responsibility,[14] it adopted a limited program. Our task is to discern its limits.
 
 
 26
 There are four groups of police officers that Congress could cover by passing a death benefits statute. Listed from narrowest to broadest, they are:
 
 
 27
 (1) All officers who die as the result of a criminal act or hazardous activity;
 
 
 28
 (2) All officers who die from an injury sustained in the course of employment as the result of an accident or a criminal act (expanding the first group to include victims of job-related accidents);(3) All officers who die from any job-related cause (expanding the second group to include victims of diseases and stress-induced infirmities which are job-related);
 
 
 29
 (4) All officers who die, from any cause (i.e., a de facto life insurance program).
 
 
 30
 The fourth group was clearly not covered by the Benefits Act,[15] and the question of whether the third group was covered is not raised in this case. The only issue here is whether, by covering deaths occurring "in the line of duty," Congress limited coverage to the first group, or extended it to the second group as well.
 
 
 31
 It is clear that Congress was concerned primarily with the first group: officers who fall victim to the special risks attending police duty. Murders of police officers dramatize the vital service police officers render and the great dangers they face. The congressional debates and legislative history are replete with stories of young officers who were killed by violence while protecting the public[16] and with statistics indicating the number of police officers killed by violence annually.[17] The original House version of the Benefits Act, H.R. 366, 94th Cong., 2d Sess. (1976), U.S.Code Cong. & Admin.News, 1976 p. 2504, was directed at only these cases. It limited coverage to officers whose deaths resulted from criminal acts or from the performance of hazardous duties,[18] and the legislative history is explicit that coverage was not extended to officers whose deaths resulted from routine accidents, even job-related ones.[19]
 
 
 32
 However, when the Benefits Act was debated in the Senate several senators objected that its coverage was to uncertain and narrow.[20] To cure this perceived defect, Senator Moss introduced an amendment broadening coverage to include any police officer who dies "as the direct and proximate result of a personal injury sustained in the line of duty." 122 Cong. Rec. 22643 (1976). The Senate manager of the bill, Senator McClellan, supported the Moss Amendment, explaining its effect as follows:
 
 
 33
 The effect of this amendment is to make the survivors of a law enforcement officer or fireman, as defined by the bill, eligible for receipt of benefits if the latter is killed in the line of duty. In other words, it is not health insurance, but it does provide for payment if an officer is killed in the line of duty, either by accidental or by willful assault by a criminal.
 
 
 34
 Id. at 22644-45. The amendment passed overwhelmingly. Id. at 22645. The conference committee accepted the Senate version, and the House expressly endorsed the change when approving the Conference Report. Id. at 30518. The House Conference Report explained:
 
 
 35
 The House bill authorized payment if the public safety officer's death was the result of a personal injury sustained in the line of certain hazardous duties which are specified in the bill. Such duties included: apprehending or guarding criminals; preventing crime; and other activities determined by (LEAA) to be potentially dangerous....
 
 
 36
 The Senate amendment authorized payment of the death benefit to the survivors of law enforcement officers ... for all line of duty deaths.
 
 
 37
 The Conference substitute conforms to the Senate amendment.
 
 
 38
 H.R.Conf.Rep.No.94-1501, 94th Cong., 2d Sess. 5-6, reprinted in (1976) U.S. Code Cong. & Ad. News pp. 2504, 2510-11.
 
 
 39
 It is beyond doubt that by deleting the references to criminal or inherently dangerous activity Congress meant to extend Benefits Act coverage to all victims of fatal injuries sustained in the line of duty.[21] But we still must determine precisely what Congress intended by the phrase "line of duty."
 
 
 40
 We know Congress intended to cover all job-related accidental deaths[22] and to incorporate an existing legal standard.[23] Unfortunately, there is more than one source from which the standard might derive: LEAA regulations, the workers' compensation law of the relevant state, or general workers' compensation law.
 
 
 41
 LEAA argues that Congress delegated to it the responsibility of defining "line of duty" and hence job-relatedness. We reject this argument. The legislative history indicates that Congress used "line of duty" as a term of art, with substantive meaning. By its use, Congress fashioned a delicate political compromise striking a balance between the purposes of enhancing recruitment and morale and the need to limit federal expenditures. It would frustrate the intent of Congress and threaten to upset its compromise for LEAA to take unto itself the defining of the term. The terms of the Benefits Act do not expressly delegate to LEAA the authority to define job-relatedness. Each of the provisions authorizing LEAA to promulgate regulations are general provisions enabling the agency to erect the procedural framework it needs to carry out its mission. There is no indication that the regulations may reach substantive matters.[24]
 
 
 42
 We also reject LEAA's assertion that we should defer to its interpretation of the job-relatedness standard upon the theory that courts must defer to the interpretation of a statute rendered by the agency charged with administering it. See Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). Such deference is not appropriate when the particular interpretation is outside the agency's expertise. Amchem Products, Inc. v. GAF Corp., 594 F.2d 470, 476 (5th Cir. 1979), modified 602 F.2d 724 (5th Cir. 1979). Determining whether a death is job-related is surely not a matter about which LEAA has acquired an extensive store of experience.
 
 
 43
 Russell makes her argument in the alternative. She contends first that Congress has directed LEAA to defer to state workers' compensation law, i.e., that Benefits Act payments should be made if the death would be covered under the workers' compensation law of the state where the death occurred. We reject this contention. The Act enunciates a single standard and provides uniform payments by a single administrative entity. There is no indication in the text of the statute or its legislative history that Congress intended to fragment the administration of the Benefits Act by deferring to the laws of fifty states.[25]
 
 
 44
 We agree with Mrs. Russell's alternate argument that the workers' compensation standard is the more apt guide for measuring job-relatedness under the Benefits Act. There are two reasons for this conclusion. First, it appears that Congress was actually alluding to workers' compensation law when it adopted the "line of duty" standard and stated that it was a term of art. There are three common usages of the phrase "line of duty" in the case law: to describe a police officer's murder; to describe the agency doctrine of respondeat superior ; and to describe the workers' compensation job-relatedness test. Given the legislative history, the latter is the intended usage.[26]
 
 
 45
 Second, the purposes of workers' compensation laws and the Benefits Act have common elements. We discern no reasoned basis for distinguishing between whether an injury is job-related and therefore compensable under workers' compensation law and whether a death is job-related and therefore compensable under the Benefits Act.
 
 
 46
 We conclude that by using the "line of duty" language Congress meant to adopt a job-relatedness test akin to that developed under workers' compensation law. Although workers' compensation is a statutory rather than common law doctrine and jurisdictions with different statutes have occasionally developed different rules, there is considerable doctrinal uniformity. Therefore, LEAA and the courts should look to general workers' compensation law as a guide to the development of a federal law and interpret the Benefits Act job-relatedness test consistently with workers' compensation doctrines, unless there is a significant policy reason to diverge.
 
 
 47
 Adopting this approach, we conclude that Sergeant Russell's accident is compensable. Under general workers' compensation law, the basic rule, oft described as the "going and coming rule," denies compensation for injuries sustained en route to and from work.[27] But there are several exceptions to this rule, which derive from an understanding that the employer sometimes controls the employee's commute. The Michigan Court of Appeals explains the state of the law as follows:
 
 
 48
 Having become riddled with exceptions, the general rule of noncompensability while going to and from work has evolved into a new rule which compensates injury where there is a sufficient nexus between the employment and the injury to conclude that it was a circumstance of employment.
 
 
 49
 Hicks v. General Motors Corp., Chevrolet Assembly Plant, 66 Mich.App. 38, 238 N.W.2d 194, 196 (1975). The requisite nexus has been found where the employer provides transportation to the employee, F.W.A. Drilling Co. v. Ulery, 512 P.2d 192, 194 (Okl.1973), and where the nature of the employment subjects the employee to special commuting risks, Hicks v. General Motors Corp., 238 N.W.2d at 197 (excessive traffic congestion); Briggs v. American Biltrite, 174 N.J. 185, 376 A.2d 1231, 1234 (1977) (late night overtime, fatiguing the employee).
 
 
 50
 Russell relies on a line of cases finding compensable injury where the employer had restricted the employee's choice of means of transportation, because the Los Angeles County Sheriff controlled Sergeant Russell's choice of means of transportation by requiring him to use his own car on the job. She is correct. Many jurisdictions have established an exception to the "going and coming rule" when the employee is required to use his own car at work. See, e.g., Rhodes v. Workers' Compensation Appeals Bd., 84 Cal.App.3d 471, 148 Cal.Rptr. 713 (1978); Davis v. Bjorenson, 229 Iowa 7, 293 N.W. 829 (1940); Pittsburg Testing Laboratories v. Kiel, 130 Ind.App. 598, 167 N.E.2d 604 (1960); Begley v. International Terminal Operating Co., 114 N.J.Super. 537, 277 A.2d 422 (1971); Lutgen v. A. Conte Electrical, Inc., 50 App.Div.2d 624, 374 N.Y.S.2d 434 (1975); Bebout v. State Accident Ins. Fund, 22 Or.App. 1, 537 P.2d 563 (1975), aff'd, 273 Or. 487, 541 P.2d 1293 (1975); Bailey v. State Indus. Comm'n, 16 Utah 2d 208, 398 P.2d 545 (1965). See generally I A. Larson, Workmen's Compensation Law § 17.50 (1972). We find no jurisdiction which rejects the exception.[28]
 
 
 51
 Sergeant Russell was expressly required to have a driver's license and a car of his own to perform his job. He was required to bring the car to work and usually spent much of his work day on the road. He used his car for job-related activities on the day of the accident. When driving home he was rendering a service to his employer by transporting a piece of law enforcement equipment. In addition, his employment conditions increased the hazards of his commute, because as weekend duty detective he had to put in long hours and drive home at a particularly dangerous time-late on a Saturday night. We conclude that Russell was engaging in a job-related activity at the time of his death and therefore that his death occurred in the line of duty.[29]
 
 
 52
 In summary, LEAA applied an erroneous legal standard. We reverse and remand with instruction that LEAA pay a $50,000 death benefit to Mrs. Russell for herself and in her representative capacity for her children in accordance with the payment provisions of the Benefits Act.
 
 
 
 *
 Honorable Gus J. Solomon, Senior United States District Judge for the District of Oregon, sitting by designation
 
 
 [1]
 The clause in 42 U.S.C. § 3759(a) (1976), authorizing review of an "application or plan submitted under this chapter" is not an alternative source of review. The language is surplusage. It was adopted several years before passage of the Benefits Act, when all applications or plans submitted to LEAA were covered by 42 U.S.C. § 3758 (1976). Therefore this clause had no effect on reviewability. This conclusion is confirmed by the fact that the recent revision of the LEAA Act, discussed infra, omits the clause. Justice System Improvement Act of 1979, Pub.L.No.96-157, § 805, 93 Stat. 1167 (1979)
 
 
 [2]
 42 U.S.C. § 3757 (1976) relates to revocation of formerly approved grant applications. It is not relevant here
 
 
 [3]
 42 U.S.C. § 3759 (1976) limits the manner of review to direct review by the courts of appeals in subsection (a) and limits the extent of review in subsections (b) and (c), which provide:
 (b) The determinations and the findings of fact by (LEAA), if supported by substantial evidence, shall be conclusive; but the court, for good cause shown, may remand the case to (LEAA) to take further evidence. (LEAA) may thereupon make new or modified findings of fact and may modify its previous action, and shall file in the court the record of the further proceedings. Such new or modified findings of fact or determinations shall likewise be conclusive if supported by substantial evidence.
 (c) Upon the filing of such petition, the court shall have jurisdiction to affirm the action of (LEAA) or to set it aside, in whole or in part. The judgment of the court shall be subject to review by the Supreme Court .....
 
 
 [4]
 In doing so, we reach three subsidiary conclusions which harmonize the relationships among subsections 3758(a), (b), (c), and section 3759. First, we interpret the language of subsection 3758(a) as making the subsection applicable not only to the sections concerning financial and technical assistance grants, but to all of chapter 46 of title 42, including the Benefits Act. Therefore, judicial review of any LEAA function, including Benefits Act denials, is precluded except as "hereafter provided." Second, subsection 3758(a) does not limit review to cases which are covered by subsections 3758(b) and (c), i. e., financial and technical assistance grants, but merely limits the manner and extent of review to that provided by section 3759. Third, by providing judicial review of "final action ... under section 3758," section 3759 extends review to any final action which is covered by subsection 3758(a), even when not covered by subsections 3758(b) and (c)
 
 
 [5]
 These revisions are valuable guides. Although the instant case must be decided under the terms of the old LEAA Act rather than the Revised Act, we may look to subsequent amendments to assist us in resolving ambiguity. Amchem Products, Inc. v. GAF Corp., 594 F.2d 470, 477-79 (5th Cir. 1979) modified, 602 F.2d 724 (5th Cir. 1979); May Dep't Stores Co., Inc. v. Smith, 572 F.2d 1275, 1277 (8th Cir.) cert. denied, 439 U.S. 837, 99 S.Ct. 122, 58 L.Ed.2d 134 (1978). See 2A A. Sutherland, Statutes and Statutory Construction § 49.11, at 266 (4th ed. C. Sands 1973). The legislative history of the Revised Act does not reveal a congressional intent to alter substantively the relationship between the Benefits Act and the judicial review provisions of the LEAA statute. The reorganization of the sections in one statute and the revised language simply clarifies the original legislative intent
 
 
 [6]
 These changes clarify each of the three points made in note 4, supra. First, subsection 3758(a) (new section 3784) is broad, precluding review of any LEAA function except as "hereafter provided." Second, by limiting review to the extent and manner "hereafter provided," subsection 3758(a) is referring to the provisions governing judicial review in section 3759 (new section 3785) and not to the provisions regarding administrative review of grant application denials in subsections 3758(b) and (c), new subsections 3783(a) and (b). This is clearer because new section 3784 follows, rather than precedes, new subsections 3783(a) and (b). Third, the "throwback" provision of section 3759 (new section 3785) is not limited to actions which fall within subsections 3758(b) and (c) (new subsections 3783(a) and (b)), but also applies to actions which fall only within subsection 3758(a) (new section 3784). This is clearer because new section 3785 explicitly provides judicial review of any final action under either section 3783 or section 3784
 
 
 [7]
 In fact, denial of an application for Benefits Act payments is probably better suited to judicial review than is denial of an application for a grant under subsections 3758(b) and (c), which is clearly reviewable, because grant denials frequently involve the evaluation of nebulous competitive factors among competing state and local law enforcement agencies rather than the application of legal doctrines
 
 
 [8]
 On the other hand, another program, the Federal Employees Compensation Act, 5 U.S.C. §§ 8101-8193 (1976), precludes judicial review of administrative determinations. Its preclusion, however, is very explicit. 5 U.S.C. § 8128(b) (1976) provides in pertinent part:
 The action of the Secretary or his designee in allowing or denying a payment under this subchapter is -
 (1) final and conclusive for all purposes and with respect to all questions of law and fact; and
 (2) not subject to review by another official of the United States or by a court by mandamus or otherwise.
 
 
 [9]
 The Lankford court gave two main reasons for its refusal to review Benefits Act cases. First it stated that the use of differing terminology shows that Congress intended the two statutes-the Omnibus Act and the Benefits Act-to be treated separately, giving great weight to the fact that the Omnibus Act refers to "applications" for "grants," the Benefits Act to "claims" for "benefits." We think this point weaker than does the Lankford court. The presumption that Congress used its words precisely as part of a coherent structure, and hence that the use of different terms in different sections shows an intention to give them separate meanings, is strongest when the terms are used in a single act, passed at one time. Here we have two acts passed eight years apart. The use of different terms is as likely to have been careless as planned, particularly since the legislative history reveals no intention to attach discrete meanings. We also note that the words "application," "claim," "grant," and "benefit" are not terms of art, and "application" is used frequently in conjunction with "benefit" in title 42 of the United States Code. See, e.g., 42 U.S.C. § 402(j) (1976); 42 U.S.C. § 1395nn(a)(1) (1976)
 Second, the Lankford court relied on the separate regulatory authorizations contained in the Omnibus Act and the Benefits Act. Compare 42 U.S.C. §§ 3751, 3796 (1976). We suspect that this overlap was due to overcautious drafting and note that LEAA itself considers both regulatory provisions applicable to the Benefits Act. It cites both as authority for its Benefits Act regulations. See 28 C.F.R. Part 32 (1980).
 Finally, we note that the Lankford court did not consider the arguments we find most telling-the meaning of section 3758(a) and the presumption against precluding judicial review.
 
 
 [10]
 For the sake of simplicity we use the term "police officer" throughout the opinion. We recognize, though, that the Benefits Act actually refers to "public safety officers" and defines that term to include members of fire departments as well as law enforcement officers. 42 U.S.C. §§ 3796(a), 3796b(7) (1976)
 
 
 [11]
 42 U.S.C. § 3796(a) (1976) provides in pertinent part:
 In any case in which (LEAA) determines, under regulations issued pursuant to this subchapter, that a public safety officer has died as the direct and proximate result of a personal injury sustained in the line of duty, the Administration shall pay a benefit of $50,000 ....
 
 
 [12]
 At oral argument Mrs. Russell also contended that it was not clear whether Sergeant Russell was driving home or driving to an investigative stop when the accident occurred. However, our examination of the factfindings underlying an LEAA denial is limited to determining whether they are supported by substantial evidence. 42 U.S.C. § 3759(b) (1976); Massachusetts Dep't of Correction v. Law Enforcement Assistance Administration, 605 F.2d 21 (1st Cir. 1979). There is substantial evidence to support LEAA's finding that Russell was driving home when the accident occurred
 
 
 [13]
 See H.R. Rep. No. 94-1032, 94th Cong., 2d Sess. 3 (1976); 122 Cong. Rec. 12002 (1976) (remarks of Rep. Eilberg); id at 12003 (remarks of Rep. Matsunaga); id. at 12004 (remarks of Rep. Drinan); id. at 12008 (remarks of Rep. Minish); id. at 12008-9 (remarks of Rep. Russo); id. at 12011 (remarks of Rep. Conte); id. at 22644 (remarks of Senator Moss); id. at 30521 (remarks of Rep. Eilberg and Rep. Sarbanes). The purpose of the Benefits Act was explained more generally in the Senate Report:
 The motivation for this legislation is obvious: The physical risks to public safety officers are great; the financial and fringe benefits are not usually generous; and the officers are generally young with growing families and heavy financial commitments. The economic and emotional burden placed on the survivors of a deceased public safety officer is often very heavy.
 The dedicated public safety officer is concerned about the security of his family, and to provide the assurance of a Federal death benefit to his survivors is a very minor recognition of the value our government places on the work of this dedicated group of public servants.
 S. Rep. No. 94-816, 94th Cong., 2d Sess. 1, 3-4 (1976), reprinted in (1976) U.S. Code Cong. & Ad. News, pp. 2504-05.
 
 
 [14]
 Several opponents focused on the extent to which the Benefits Act would weaken the federal system. 122 Cong. Rec. 12010-12 (1976) (remarks of Rep. Wiggins; response of Rep. Pattison); id. at 12015 (general debate); H.R. Rep. No. 94-1032, 94th Cong., 2d Sess. 17-21 (1976) (dissent from Committee Report)
 
 
 [15]
 Senator Kennedy amended the Senate version of the bill by adding a comprehensive life insurance program. The amendment passed the Senate but was deleted in conference. 122 Cong. Rec. 30712 (1976)
 
 
 [16]
 See 122 Cong. Rec. 12004, 12005, 12008, 12017 (1976)
 
 
 [17]
 H.R. Rep. No. 94-1032, 94th Cong., 2d Sess. 3 (1976); S. Rep. No. 94-816, 94th Cong., 2d Sess. 5 (1976), reprinted in (1976) U.S.Code Cong. & Ad. News pp. 2504, 2506; 122 Cong. Rec., 22634, 22644 (1976)
 
 
 [18]
 The original version of the Benefits Act, H.R. 366, provided:
 Sec. 701. (a) In any case in which (LEAA) determines, under regulations issued under part F of this title, that an eligible safety officer has died as the direct and proximate result of a personal injury sustained in the performance of duty, leaving a spouse or one or more eligible dependents, (LEAA) shall pay a gratuity of $50,000 ....
 (g) As used in this section, the term "eligible public officer" means any individual serving, with or without compensation, a public agency in an official capacity as a law enforcement officer who is determined by (LEAA) to have been, at the time of his injury, engaged in-
 (1) the apprehension or attempted apprehension of any person-
 (A) for the commission of a crime, or
 (B) who at the time was sought as a material witness in a criminal proceeding; or
 (2) protecting or guarding a person held for the commission of a crime or held as a material witness in connection with a crime; or
 (3) the lawful prevention of, or lawful attempt to prevent, the commission of a crime ....
 H.R. 366, 94th Cong., 2d Sess. (1976).
 
 
 [19]
 The House Report stated:
 The committee expects that LEAA regulations should make it clear that a simple accident which occurs in the performance of routine, non-hazardous duties is not within the scope of coverage or the rationale of this bill. In other words, the bill is not designed to cover an accidental death of a policeman who is engaged in his normal patrol activities.
 H.R. Rep. No. 94-1032, 94th Cong., 2d Sess. 5 (1976). During the House debate Congresswoman Holtzman, an opponent of the bill, said: "What happens if a policeman on his way home ... is involved in an automobile accident and is killed? There is not a single penny in this bill that would assist his family." 122 Cong. Rec. 12017-18 (1976). In response one of the bill's advocates, Congressman Sieberling, admitted that such an accident would not be covered. Id. at 12018.
 
 
 [20]
 Senator Moss explained the deficiencies his amendment was meant to correct:
 (B)y requiring that the benefit be limited to death resulting from an injury directly or proximately caused by a criminal act, the committee has failed to provide for the stated purpose and need of this legislation. This specific language leaves a loophole in the bill whereby those who should be benefited and are deserving may be excluded. There can arise a situation which may give cause to question whether a death was actually the result of a criminal act. An excellent example is the police officer who is directing traffic.
 
 
 [122]
 Cong. Rec. 22644 (1976). Senator Allen supported the amendment and explained its purpose as follows:
 I thought the chief shortcoming of the bill as it came out of the committee was the provision that, in order to qualify the family of the officer for this death benefit, he would be required to have been killed as a result of a criminal act. That would always put on the family the burden of proof that a criminal act had caused the death. I think it is sufficient that the death occur while the public safety officer, including law enforcement officers and firemen, is engaged in the performance of his duty. I think this amendment will greatly improve the bill and make it equitable, make it fair, make it easier to provide benefits for those entitled to the benefits.
 Id. at 22645.
 
 
 [21]
 In its brief LEAA quotes a statement in the Senate Report explaining that H.R. 366 was intended to compensate line of duty deaths caused by "a criminal act or an apparent criminal act." S.Rep.No.94-816, 94th Cong., 2d Sess. 6 (1976), reprinted in (1976) U.S. Code Cong. & Ad. News pp. 2504, 2507. However, the Senate Report related to the original version of the bill, before the Moss Amendment deleted the quoted language
 
 
 [22]
 Senator McClellan stated:
 Line of duty, as used in this bill, is intended to mean that the injury resulting in the officer's death must have occurred when the officer was performing duties authorized, required, or normally associated with the responsibilities of such officer acting in his official capacity as a law enforcement officer ....
 
 
 [122]
 Cong.Rec. 22634 (1976). The Conference Report concurred:
 (I)t is appropriate to extend coverage to all acts performed by the public safety officer in the discharge of those duties which are required of him in his capacity as a law enforcement officer ....
 H.R.Conf.Rep.No.94-1501, 94th Cong., 2d Sess. 6, reprinted in (1976) U.S. Code Cong. & Ad. News pp. 2504, 2511. In addition, during the floor debate on the Moss Amendment several senators cited examples of deaths which would not be covered under the stricter House version but would be covered by the Moss Amendment. These examples included purely accidental job-related deaths.
 
 
 [23]
 The Senate Report stated that "(t)he term 'line of duty' as used in this bill has the customary usage." S.Rep.No.94-816, 94th Cong., 2d Sess. 6 (1976), reprinted in (1976) U.S. Code Cong. & Ad. News pp. 2504, 2507. The House Conference Report stated that "(t)he Managers believe that 'line of duty' is a well-established concept." H.R.Conf.Rep.No.94-1501, 94th Cong., 2d Sess. 6 (1976), reprinted in (1976) U.S. Code Cong. & Ad. News pp. 2510, 2511. When introducing the Conference Report to the House, one the House Managers, Representative Eilberg, stated that "(t)he Managers on both sides ... believed that the concept of line of duty is well defined and that this type of coverage will greatly facilitate the administration of this Act." 122 Cong.Rec. 30518 (1976). During a debate on the Conference Report, Representative Brown asked whether a police officer was covered anytime he was "within the scope of his employment," even though he acted negligently, and another of the House Managers, Representative Sarbanes, responded that "I think the phrase 'line of duty' is a work (sic) of art. It is not defined precisely as the gentleman is defining it. However, (Representative Brown's interpretation) is correct." Id. at 30520
 
 
 [24]
 LEAA has in fact promulgated regulations defining "line of duty." 28 C.F.R. § 32.2(c) (1980) provides in pertinent part:
 "Line of duty" means any action which an officer whose primary function is crime control or reduction, enforcement of the criminal law, or suppression of fires is obligated or authorized by rule, regulation, condition of employment or service, or law to perform, including those social, ceremonial, or athletic functions to which he is assigned, or for which he is compensated, by the public agency he serves.
 This definition seems entirely consistent with the workers' compensation job-relatedness standard we apply infra. In this case, however, LEAA ignored an established doctrine encompassed by the job-relatedness standard. It is irrelevant whether this error results from some subtlety lurking in the language of LEAA's regulation, or from a misinterpretation of the regulation. Either way, the agency has applied an erroneous legal standard.
 
 
 [25]
 Russell also argues that Congress intended the employer's definition of line of duty to govern, but she points to nothing in the statutes or legislative history to support that proposition
 
 
 [26]
 The first use of the phrase "line of duty" is to describe a police officer's murder while performing police duties. For example, several jurisdictions impose a mandatory death penalty for killing a police officer who is "in the line of duty." See Roberts v. Louisiana, 431 U.S. 633, 97 S.Ct. 1993, 52 L.Ed.2d 637 (1977). As stated previously, murders of police officers were of paramount concern to the supporters of the Benefits Act. However, by adopting the Moss Amendment and thereby deleting all reference to criminal acts or inherently dangerous activity, Congress expressly expanded coverage beyond these cases. The second common use of the phrase is under the tort doctrine of respondeat superior, according to which an employer is liable for torts an employee commits "in the line of duty." We think it unlikely that Congress would import the respondeat superior standard into the Benefits Act, because the purposes of the two doctrines are dissimilar. Respondeat superior is concerned with attributing fault to an employer because he controlled, or should have controlled, the employee's activities. See Seavey, Handbook of the Law of Agency §§ 83-84, at 141-42 (1964). The Benefits Act, on the other hand, is simply concerned with compensating job-related deaths
 
 
 [27]
 See Butt v. City Wide Rock Excavating Co., 204 Neb. 126, 281 N.W.2d 406, 407 (1979)
 
 
 [28]
 In Rhodes v. Workers' Compensation Appeals Bd., 84 Cal.App.3d 471, 148 Cal.Rptr. 713 (1978), the court explained the reason for the exception as follows:
 An exception to the going and coming rule is where the employer requires that the employee bring a car to and from work for use in his employment duties. In such a case the obligations of the job reach out beyond the employer's premises, make the vehicle a mandatory part of the employment, and compel the employee to submit to the hazards associated with private motor travel, which otherwise the employee would have the option of avoiding.
 
 
 [148]
 Cal.Rptr. at 715 (citations omitted). Professor Larson supports this view, noting that workers' compensation coverage is extended in such situations not only because the employee's choice to means of transportation is constrained but also because the employee is serving the employer by conveying a major piece of business equipment to the business premises. I A. Larson, Workmen's Compensation Law § 17.50 (1972)
 
 
 [29]
 This result is consistent with the determinations made by the State of California and Los Angeles County. Russell's survivors were awarded county death benefits which are paid when a death occurs "in the performance of duty," Cal.Gov't Code §§ 31787.5, 31787.6 (West Supp.1980), and state workers' compensation for a death "in the course of employment," Cal.Lab.Code § 3600 (West Supp.1980)