Pamela H. YANCO, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 98–515C.

United States Court of Federal Claims.

Jan. 18, 2000.

Jeffrey L. Allen, Wellesley Hills, MA, attorney of record, for plaintiff.

Elizabeth W. Newsom, Washington, D.C., with whom was Acting Assistant Attorney General David W. Ogden, for defendant.

## OPINION

LYDON, Senior Judge.

In this action, plaintiff challenges a determination by the Bureau of Justice Assistance, Office of Justice Programs, U.S. Department of Justice (the Bureau), denying her and her children eligibility to receive death benefits under the Public Safety Officers' Benefits Act, 42 U.S.C. § 3796 (1988 & Supp. III 1991) (PSOBA). Both parties have moved for summary judgment, and the administrative record has been filed with the Court.[1] For reasons set forth below, defendant's motion for summary judgment is granted and plaintiff's cross-motion for summary judgment is denied.

### Facts

#### 1. *Background Information*

William Yanco served on the Wellesley, Massachusetts, police force for some 21 years, from 1971 until the day of his death on June 22, 1992. It is undisputed that at the time of his death Officer Yanco was married and had two children. Initially, Officer Yanco served as a patrol officer but was promoted to the position of Safety Officer in 1983. In 1989, Officer Yanco became the Drug Abuse Resistance Education (D.A.R.E.) Officer. In 1992, Officer Yanco became the Youth Officer.

As the Safety Officer, and thereafter as the D.A.R.E. and the Youth Officer, Officer Yanco designed programs to promote child health and safety and to prevent juvenile delinquency. Specifically, as the D.A.R.E. Officer, he taught drug resistance classes and

presided over D.A.R.E. graduations. As the Youth Officer, he counseled troubled children and their families. As part of his authorized duties, Officer Yanco visited the homes of both troubled and untroubled children.

Officer Yanco "lived for his work," continually finding new ways to assist children and routinely dedicating extra hours to children in need. As an example, Officer Yanco created a D.A.R.E. student box where students deposited written questions they did not feel comfortable asking in class. He also installed a separate telephone line and answering machine in his office which enabled children to communicate with him privately and/or leave confidential messages. Following Officer Yanco's death, the Wellesley Chief of Police found that it required two and a half officers to cover his duties.

Prior to June 22, 1992, family, friends, and colleagues viewed Officer Yanco as a gregarious and energetic person. He was described by them as a person who put the well-being of others, particularly children, before his own; a person who met all problems "head on" with optimism and, often, humor. For example, in the mid–1980's, when he was diagnosed with malignant melanoma and given a 50% percent chance to live, Officer Yanco faced this physical setback by educating himself on the disease, seeking aggressive treatment, and manifesting a resolve to live. By all accounts, service to youth was the core of his life and he was happiest when helping children. He took great pride in the fact that children responded to him, trusted him, and confided in him. Fellow officers and teachers fondly recalled how, at D.A.R.E. graduations, "Officer Bill" would be "swamped by kids," expressing affection and thanking him. Officer Yanco was also well known in the community as a first-rate youth soccer coach and was popular with his team and team parents.[2]

---

1. Defendant has also moved to dismiss the complaint for failure to state a claim under Rule 12(b)(4). In the context of this case, summary disposition of the case under Rule 56 is deemed more appropriate than disposition under Rule 12(b)(4). Motions for judgment on the administrative record are generally treated in accordance with the rules governing motions for summary judgment. *See* RCFC 56.1.

2. Most of the facts in this section were taken from the "Findings Of Fact" of the Administrative Hearing Officer. They were supported by the record before him. On appeal, the Bureau Director accepted the Hearing Officer's findings (Nos. 1–5) set forth in the first three paragraphs above but rejected his findings (Nos. 6–8) set out in the fourth paragraph above, without explana-

## 2. *The Crucible Period*

### - A -

On May 28, 1992, during a follow-up home visit, the mother of a troubled youth counseled by Officer Yanco accused him of engaging in sexually inappropriate behavior with her ten-year old son. Officer Yanco immediately reported this allegation to his superior, Lieutenant Donald Whalen. On June 1, 1992, the Wellesley Police Chief learned of the allegation.

Following this allegation, a series of investigations were undertaken. Investigations were conducted by the Internal Affairs Office of the Wellesley Police, which concluded that Officer Yanco did not engage in any misconduct with respect to the allegation of May 28, 1992; by the Department of Social Services (DSS), which found no evidence of abuse and declined to pursue the allegation further; by the District Attorney's (DA) Office of Norfolk County, Massachusetts, which determined that no crime occurred and referred the matter back to the Wellesley Police Department.

The May 28, 1992 allegation and subsequent investigations also captured the attention of the local Board of Selectmen, which requested a full report. The May 28, 1992 allegation and subsequent investigations also garnered significant media attention. The record shows, and while not set forth by the Hearing Officer, it appears to be undisputed, that Officer Yanco was aware before June 22, 1992, of the actions of the D.A.'s office and the DSS office discussed above. The last investigation by the Internal Affairs Office was concluded after Officer Yanco's death on June 22, 1992, and resulted in his being cleared finally of any and all charges. It is stipulated by the parties that Officer Yanco did not engage in any misconduct relative to the allegation of May 28, 1992.[3]

### - B -

Following the May 28, 1992 allegation, Officer Yanco appeared acutely distressed and could not work the remainder of that day and, accordingly, was sent home by his superior. Both his superior, Lieutenant Whalen, and his wife, plaintiff herein, agreed that "the allegation hit him like a sledgehammer," striking at the core of his person as a trusted youth officer. Thereafter, he was uncharacteristically agitated, irritable, and withdrawn, leaving work early, avoiding phone calls and social situations, and snapping at this two sons and the children on his soccer team.

During the 25-day period following the May 28, 1992 allegation, Officer Yanco suffered pervasive mood disturbances that resulted in crying spells, loss of sleep, appetite and the capacity for enjoyment. Indeed, family, friends, and colleagues described him during this period as "detached," "far away," and utterly unaware of events going on around him. During this period, Officer Yanco did manifest two short occasions of lucidity, namely arranging the funeral of a young fellow police officer who had died in the line of duty and submitting a voucher for a police convention weeks away. While he grieved normally over the police officer's death, he did not express any guilt over the officer's death nor did he seem obsessed over his death. He felt proud of his work in organizing the memorial service for his fellow officer. Other than these occasions, Officer Yanco became increasingly isolated and irrational.

The accusation of sexual misconduct with a minor was a traumatic and devastating blow for Officer Yanco. From the time of the allegation and the 25-day period thereafter, he felt that his career was hopelessly ruined. This hopeless feeling dominated his existence. Unlike the fighting spirit he displayed in his battle with cancer, he saw no way out of this situation. He was convinced that "everyone knew" of the matter, that no one would believe him, and that the community would never trust him again. He rejected the support of his wife and colleagues and

---

tion, since, ostensibly, they were immaterial to the Director's determination that Officer Yanco's widow and children were not eligible for death benefits.

**3.** The facts in this section were taken from the "Findings of Fact" (Nos. 9–14) of the Administrative Hearing Officer. They were supported by the record before him. On appeal, the Bureau Director accepted those facts set forth by the Hearing Officer.

attempted to avoid all children, even his own sons.

Discussions with his wife centered on the allegation of child abuse. He constantly reviewed the allegation and the events of May 28th. His wife urged him to seek professional help but, feeling too ashamed, he refused. Further, Officer Yanco continually anticipated media attention, and each bit of news on the matter affirmed in his mind the fact that his life and career were destroyed. More importantly, he saw no solutions. To him, his future appeared darker and darker and his options fewer and fewer. The allegation, for him, was a single-track thought process, and he manifested a complete inability to reasonably and rationally connect with others as June 22nd dawned.

While not set forth by the Hearing Officer in his Findings of Fact, it is undisputed that Officer Yanco reported for work on June 22, 1992. Officer Yanco attended graduation ceremonies for the D.A.R.E. program and thereafter had a conversation with his supervisor who suggested he take the rest of the afternoon off and return to New Hampshire to vacation with his family. Before departing the police station, Officer Yanco left two letters on the police station computer but they were not printed out. The letters were addressed to his wife and his older son. The letter to his wife was written at 12:35 p.m. While the letters did not mention suicide, a reasonable reading of these letters suggests that Officer Yanco was seriously considering taking his own life. Before leaving the police station, Officer Yanco also submitted a voucher for funds relative to his attendance two months later at a police-oriented convention.

On or about 2:00 p.m. on June 22, 1992, Officer Yanco called the Wellesley Police Department from his home. The call was recorded on tape. He talked to Lieutenant Whalen (his superior) and another officer who tried to reason with him but failed to "reach him." There is a specific moment on the tape when it is evident that Lieutenant Whalen "loses" Officer Yanco. At that moment, Officer Yanco stops responding and sobbing and begins to pray. Lieutenant Whalen says "[at that moment] a chill went over me ... we lost him ... he was no longer rational." It is undisputed that Wellesley police officers dispatched to his home as a result of his phone call failed to arrive in time to prevent his death. There is no dispute about the fact that on June 22, 1992, at approximately 2:30 p.m., Officer Yanco died from a self-inflicted gunshot wound while at his home.

### - C -

Officer Yanco had no history of job-related stress prior to the allegation. He had no history of mental disease and no history of suicide attempts. He had no medical problems; the cancer he battled earlier did not recur. Plaintiff, Pamela Yanco, describes her marriage as a happy and healthy one, with no serious conflicts. The Yanco's had no financial problems.[4]

### 3. *Subsequent Administrative Proceedings*

### - A -

Plaintiff, as the widow of Officer Yanco, applied to the Town of Wellesley Retirement Board for pension benefits based upon Officer Yanco's death occurring in the line of duty. Such benefits were available under Section 9 of Chapter 32 of the Massachusetts General laws. A psychologist and a psychiatrist submitted reports in support of plaintiff's claim for pension benefits. The psychologist found that Officer Yanco was innocent of any sexual misconduct, but that Officer Yanco genuinely believed that his reputation could never recover from the allegation of May 28, 1992, and so ended his life because of that allegation, which arose while in the conduct of his duties as a police officer for the Town of Wellesley. In substance, the psychologist concluded Officer Yanco's suicide was causally related to his

---

4. The facts in the first four paragraphs and the sixth and seventh paragraphs, set forth above in this section, were taken from the "Findings of Fact" (Nos. 16–21, 23–26) of the Administrative Hearing Officer. They are supported by the record before him. On appeal, the Bureau Director rejected these facts without explanation. See note 2. However, the Bureau Director does refer to the telephone call discussed in paragraph six and the notes discussed in paragraph seven above in her Decision at paragraph 5, set out *infra* in the text.

work as a police officer and thus occurred in the line of duty. The psychiatrist believed Officer Yanco suffered from an untreated mental disease. On or about August 26, 1993, the Retirement Board held that Officer Yanco died in the line of duty and awarded pension benefits to plaintiff. On September 20, 1993, the Massachusetts Division of Public Retirement Administration completed a state level review of the Town Retirement Board decision and affirmed this decision, thus finalizing plaintiff's pension claim.

- B -

On June 9, 1993, plaintiff filed a Claim For Death Benefits with the Public Safety Officers' Benefit Act Office (PSOBO), a division of the Bureau, on her own behalf, as a surviving spouse, and on behalf of her surviving two children. The claim for benefits was made pursuant to 42 U.S.C. § 3796 "... as a result of the death of [William Yanco] ... who sustained fatal injury in the line of duty...." [5]

On October 26, 1993, plaintiff's claim was denied by the Director of the Public Safety Officers' Benefits Program, Department of Justice. The basis for this denial was set forth in a Claim Determination, prepared by a Claims Officer on July 27, 1993, with the Concurrences of the Office of General Counsel on October 14, 1993, and the Director on October 18, 1993.

- C -

On November 23, 1993, plaintiff noted an appeal of the denial of death benefits to the PSOB Office. On December 14, 1994, plaintiff filed a formal eight-page written submission in support of her appeal to the Acting Director of the PSOB Program.

A Hearing Officer was authorized by the Bureau to conduct a hearing on plaintiff's appeal, and a hearing was held on November 9, 1995. Bureau Regulations (28 C.F.R. § 32.24) require the Hearing Officer to "conduct the hearing in such manner as to best ascertain the rights of the claimant." On December 6, 1995, the Hearing Officer ren-

dered his "Determination On Appeal." The Hearing Officer determined that Officer Yanco's suicide was the result of a traumatic injury sustained in the line of duty and was an unintentional act within the purview of the PSOB Act entitling plaintiff and her children to receive benefits under the Act. In reaching his determination, the Hearing Officer noted that he:

... relied principally on the report and testimony of Laurie Raymond, M.D., a widely regarded expert on job related Post Traumatic Stress Disorder, the report and testimony of Dr. James Beck, M.D., Ph.D., a forensic psychiatrist currently serving as Director of the Cambridge Court Clinic, Cambridge, Massachusetts, Chief of Forensic Psychiatry at Cambridge Hospital and Associate Professor of Psychiatry at Harvard Medical School, and the report of Ronald Ebert, Ph.D., Senior Forensic Psychologist At McLean Hospital, Belmont, Massachusetts. Dr. Ebert testified before the House Armed Forces Committee concerning the USS IOWA incident. I also relied on the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, the report of Chief of Police Thomas O'Loughlin, the testimony of Sergeant Robert Meaney, the observations of Lieutenant Donald Whalen and Pamela Yanco and the tape of the last eighteen minutes of Officer William Yanco's life.

Based on the medical evidence before him, the Hearing Officer found that from the time of the false allegation on May 28, 1992, until the time of his death on June 22, 1992, Officer Yanco suffered from Post Traumatic Stress Disorder (PTSD) and Major Depression (depression) (H.O. Finding No. 15.) He also found that the accusation of sexual misconduct with a minor was a traumatic, devastating event for Officer Yanco; that the allegation was "an event outside the usual range of human experience that would be markedly distressing to almost anyone" and presented a serious threat to his emotional integrity and professional standing. Officer Yanco

---

**5.** The claim process is described in *Smykowski v. United States*, 227 Ct.Cl. 284, 647 F.2d 1103, 1105 n. 4 (1981).

persistently reexperienced the allegation and exhibited the vast majority of symptoms associated with PTSD and depression the Hearing Officer described in his Findings of Fact Nos. 17–26. The Hearing Officer also referenced the American Psychiatric Association's Diagnostic and Statistical Manual of Medical Disorders IV (1994) (DSM–IV and/or DSM–III–R (1987)) (H.O. Finding No. 16).

The Hearing Officer found that, over his last 26 days, Officer Yanco suffered progressive "ego constriction," meaning he lost the ability to cognitively connect with others and understand events going on outside of the allegation of sexual misconduct and the ensuing investigations and news coverage. He was, the Hearing Officer found, eventually unable to distinguish right from wrong. The Hearing Officer found that Officer Yanco's ego constriction was evidenced by the notes he wrote to his family on June 22, which made it apparent that he was unable to say goodbye in a meaningful way, leaving the notes unfinished on a computer screen and leaving no note to his younger son. The Hearing Officer also found that the testimony of Lieutenant Whalen relative to his telephone conversation with Officer Yanco shortly before his death was such that he felt that Officer Yanco was no longer rational and that efforts to reach him were lost. (H.O. Finding Nos. 22, 25, 26).

The Hearing Officer also found that the allegation of misconduct alone led to Officer Yanco's mental injuries. (H.O. Finding 39).

### - D -

Under Bureau Regulations (28 C.F.R. § 32.24(g and h)), "the hearing officer's determination shall be the final agency decision except when it is reviewed by the Director . . . ." The Director may, on his or her own motion, review a determination made by a hearing officer. The regulations prescribe the procedures to be followed if the Director decides to review a hearing officer's determination. (28 C.F.R. § 32.24(i)).

In a memorandum dated June 17, 1996, from the Chief, PSOB Program, to the Director of the Bureau, recommending appeal of the Hearing Officer's determination, it was stated, in pertinent part:

The Office of General Counsel advises that, if you accept this appeal from the program office, you have the right to obtain additional information. This could include psychological autopsies conducted by experts not previously associated with this case.

By letter dated August 23, 1996, the Director notified plaintiff's attorney that she had accepted the appeal by the PSOB Program Office in the case of William Yanco. This letter stated in pertinent part:

Pursuant to the PSOB implementing regulations (28 CFR § 32), you would normally have 30 days from receipt of this letter to submit additional information to the BJA Director to inform her review and determination. In this case, however, Director Gist may exercise her right to obtain additional information and evidence in the form of psychological autopsies. Should this occur, you will be provided with copies of the psychological autopsies, and then given 30 days to respond to them and submit whatever additional information or evidence you choose.

On September 21, 1996, plaintiff's attorney submitted her response in connection with the Director's review.

By letter dated February 20, 1997, plaintiff was notified that the Director of the Bureau of Justice Assistance had reversed the determination of the Hearing Officer. The Director's Decision stated, in pertinent part, as follows:

It is my determination that the hearing officer's determination is not consistent with the PSOB Act (42 U.S.C. § 3796) and its implementing regulations, and accordingly, the above referenced claim can not be approved. Findings of Fact 1 through 5, 9 through 14, and 27 are accepted from the hearing officer's determination memorandum. The following Conclusions of Law are substituted for the hearing officer's determination:

**Conclusions of Law**

1. In order to qualify for benefits under the PSOB Act, it must be demonstrated that a public safety officer's death resulted

from a personal injury sustained in the line of duty. Section 32.2(3) [sic (e)] of the PSOB implementing regulations defines "personal injury" as a traumatic injury, or diseases which are caused by or result from such an injury, but not occupational diseases.. Traumatic injury is further defined in Section 32.2(g) of the regulations as "... a wound or condition of the body caused by external force, including injuries inflicted by bullets, explosives ... **but excluding stress and strain.**" [emphasis added]

2. Since stress is not encompassed by traumatic injury as defined in the regulations, then Officer Yanco's "injury" is not encompassed within the definition of "personal injury," and is therefore not cognizable under the PSOB Act.

3. The hearing officer's conclusion that a traumatic injury includes mental or psychological injuries is totally unfounded and without merit.

4. If Officer Yanco's self-inflicted gunshot wound is viewed as the traumatic injury, benefits still can not be paid because the injury must be sustained in the line of duty. Section 32.2(c)(1) defines line of duty as any action which an officer is obligated or authorized by rule, regulations, condition of employment or service, or law to perform. Clearly, Officer Yanco was not acting within the line of duty at the time of his death.

5. Section 1202(1) of the PSOB Act specifically precludes the award of benefits if the officer's death was caused by such officer's intention to bring about his or her own death. The record shows that Officer Yanco logically explained his reasons for despair, his fear that his reputation was irreparably ruined, and his feeling that he could not take the pressure of the possible criminal investigation and the resulting disgrace. Officer Yanco prepared notes for his wife and son, explaining the reasons for his action, approximately two hours before his suicide. Finally, Officer Yanco then called a close associate to inform him of his plans, and where to find the notes that were left. In my view, these actions indicate a carefully thought out and methodically carried through act of suicide. I find the factual record insufficient to support the hearing officer's finding that Officer Yanco was incapable of forming the intention to take his own life. Claimant has not satisfied her burden of proof on this issue.

(emphasis in original).

Plaintiff's complaint was filed in this court on June 16, 1998.

### Discussion

#### - A -

The PSOBA provides, upon the Bureau's determination of eligibility, for the payment of a death benefit of $100,000 to the surviving spouse and children of a public service officer who has died "as the direct and proximate result of a personal injury sustained in the line of duty...." 42 U.S.C. § 3796. The Bureau was "authorized to establish such rules, regulations, and procedures as may be necessary to carry out the purposes" of the Act. 42 U.S.C. § 3796. The Bureau accordingly promulgated appropriate regulations. 28 C.F.R. § 32.1 *et seq.* (7/1/98 Ed.).

In *Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694, *reh'g denied,* 468 U.S. 1227, 105 S.Ct. 28, 82 L.Ed.2d 921 (1984), the Supreme Court established the standard ("*Chevron* deference") for federal courts to use when reviewing agency action based on the agency's own promulgated regulations. The *Chevron* analysis consists of two steps. The first step is to determine whether Congress has spoken directly to the precise question in issue. If Congress has not so spoken, the court then proceeds to the second step of the analysis to determine whether the regulations interpreting the PSOBA are based on a permissible construction of the PSOBA.

If Congress has spoken directly to the precise question in issue, the Bureau, as well as the court, must give effect to the unambiguously expressed intent of Congress. *Chevron,* 467 U.S. at 842–43, 104 S.Ct. 2778; *see also Chacon v. United States,* 48 F.3d 508, 511–12 (Fed.Cir.1995). However, if Congress has not expressly addressed the issue before the court, *i.e.,* "[If] the statute is silent or ambiguous on a point, 'considerable

weight' and 'substantial deference' must be accorded the interpretation of a statute by the agency that is responsible for its implementation." *Rosete v. OPM*, 48 F.3d 514, 517 (Fed.Cir.1995) (citing *Rust v. Sullivan*, 500 U.S. 173, 184, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991)). Moreover, under such circumstances, a court may not substitute its own construction of a statutory provision or reject a reasonable interpretation made by the Bureau Director. Indeed, the court must affirm any reasonable interpretation made by the agency Director, unless it appears from the statute or its legislative history that the agency's interpretation is not one that Congress would have sanctioned. *Chevron*, 467 U.S. at 842–45, 104 S.Ct. 2778. Under the *Chevron* framework, discussed above, the court must, when appropriate, give Bureau regulations *Chevron* deference. *Chevron* deference is also due when the Bureau's interpretation of its regulations is reasonable. *See United States v. Haggar Apparel Co.*, 526 U.S. 380, 119 S.Ct. 1392, 1394–95, 1399–1400, 143 L.Ed.2d 480 (1999).[6]

The court's review of the Bureau's denial of death benefits in this case is limited to three inquiries: (1) whether there has been substantial compliance with the PSOBA and implementing regulations; (2) whether there has been arbitrary or capricious action on the part of the Bureau officials; and (3) whether there was substantial evidence supporting the Bureau's determination, *Chacon*, 48 F.3d at 511. With respect to inquiry (1), plaintiff contends the Bureau misconstrued the language of the PSOBA and implementing regulations. Such an inquiry is clearly legal in nature. With respect to inquiry (2), plaintiff charges that the Bureau arbitrarily and ca-

priciously ignored the uncontroverted and consistent opinion of three qualified experts in reversing the Hearing Officer's determination favorable to plaintiff. Consideration of inquiry (2) is mandated only if plaintiff receives a favorable determination on inquiry (1). While there does not appear to be any substantial evidence dispute regarding inquiry (3), no consideration of this matter is mandated in any event if plaintiff's contentions relative to inquiry (1) are rejected.

## - B -

The operative facts are not in dispute. On May 28, 1992, while in a duty status, Officer Yanco visited the home of a troubled youth. Such a visit was in the line of duty. During this visit, Officer Yanco was accused by the mother of the youth of sexual impropriety with her son. As a result of this allegation, Officer Yanco suffered subsequent mental problems[7] which, by way of psychological autopsies, were diagnosed as Post Traumatic Stress Disorder (PTSD) and Major Depression. Twenty-five days after the allegation was made, on June 22, 1992, Officer Yanco killed himself with his service revolver while at home and off duty.

Plaintiff contends that the May 28, 1992 allegation resulted in a mental and psychological personal injury which Officer Yanco incurred while in the line of duty and which was causally related to his death, entitling her and her children to death benefits under the PSOBA.[8]

The Bureau rejected this contention and stated, in pertinent part, as follows:

### Conclusions of Law

6. In *United States v. Haggar Apparel Co.*, the Supreme Court stated in pertinent part:

> For purposes of the *Chevron* analysis, the statute is ambiguous nonetheless, ambiguous in that the agency must use its discretion to determine how best to implement the policy in those cases not covered by the statute's specific terms. Those specifics are instructive to the agency as to the general congressional purpose, and the agency's rules as to instances not covered by the statute shall be parallel, to the extent possible, with the specific cases Congress did address.
> 119 S.Ct. at 1400.

7. Officer Yanco became severely depressed as he was convinced his reputation had been irreparably ruined and felt unable to handle the pressures of the investigations and the perceived resulting disgrace. Three different investigations of this allegation cleared Officer Yanco of any wrongdoing. Indeed, the results of two of the three investigations were made known to Officer Yanco before June 22, 1992, the day of his death.

8. In her submission, plaintiff states, "[T]he gunshot wound was not the injury suffered in the line of duty in this case." The injury, plaintiff asserts, was the false accusation by a "minor male of conduct amounting to pedophilia."

1. In order to qualify for benefits under the PSOB Act, it must be demonstrated that a public safety officer's death resulted from a personal injury sustained in the line of duty. Section 32.2(3) [sic (e)] of the PSOBA implementing regulations defines "personal injury" as a traumatic injury, or diseases which are caused by or result from such an injury, but not occupational diseases.. Traumatic injury is further defined in Section 32.2(g) of the regulations as "... a wound or condition of the body caused by external force, including injuries inflicted by bullets, explosives ... **but excluding stress and strain.**" [emphasis added]

2. Since stress is not encompassed by traumatic injury as defined in the regulations, then Officer Yanco's "injury" is not encompassed within the definition of "personal injury," and is therefore not cognizable under the PSOBA Act.

3. The hearing officer's conclusion that a traumatic injury includes mental or psychological injuries is totally unfounded and without merit.

The critical language of the PSOBA states "that a public safety officer [who] has died as the direct and proximate result of a *personal injury* sustained in the line of duty" shall be eligible for the benefit provided by the Act (emphasis supplied). 42 U.S.C. § 3796. Congress did not define "personal injury" in the Act, nor was "personal injury" defined or explained in the legislative history of the Act relative to the particular issue now before the court. While the parties cite to various portions of the legislative history in an effort to prop up their contentions that the legislative history supports their views, the best that can be said of the legislative history of the Act on the matter at issue is that it is ambiguous. Under these circumstances, the *Chevron* deference standard discussed above

comes into play. *Chacon*, 48 F.3d at 512. In the first step analysis, it is determined Congress was silent on the issue of whether a mental and psychological injury is embodied in the PSOBA's "personal injury" language.

The final questions that must now be answered are whether the Bureau's interpretation of the PSOBA and its implementing regulations was a permissible construction of the Act and was otherwise reasonable.

The Bureau, in its regulations, defined "personal injury" as a "traumatic injury," and further defined "traumatic injury" "as ... a wound or condition of the body caused by external force, including injuries inflicted by bullets, explosives ... *but excluding stress and strain*" (emphasis supplied). The Bureau concluded that the "injury" asserted by plaintiff as the basis for her claim was specifically excluded from the definition of a "traumatic injury." In the second step analysis, the court concludes that the Bureau's interpretation was based on a permissible construction of the PSOBA. *Chevron*, 467 U.S. at 842–43, 104 S.Ct. 2778.

Plaintiff maintains that the self-inflicted gunshot wound that resulted in Officer Yanco's death is not the injury that forms the basis for her claim in this case. Instead, plaintiff asserts, the injury that serves as the basis for her claim is the false accusation by a "minor male of conduct amounting to pedophilia." In other words, plaintiff contends that the allegation of sexual impropriety was a "traumatic injury" within the purview of the Act and implementing regulations. The Bureau rejected plaintiff's contention that a traumatic injury includes mental and psychological injuries which resulted from the false allegation.[9]

■ Plaintiff has the burden of showing a traumatic injury for entitlement to survivor

9. It seems obvious that the allegation itself would not be sufficient to kill an officer. *See North v. United States*, 1 Cl.Ct. 93, 97, 555 F.Supp. 382, 386 (1982); *Durco v. United States*, 14 Cl.Ct. 424, 426–29 (1988). It was Officer Yanco's perception of the allegation and his inability or unwillingness to seek help relative thereto that created the stress, the strain, and the depression within him that led to his death. Had Officer Yanco sought counseling, as urged upon him by his wife, his stress and depression might well have been brought under control (*See* Dr. Beck's testimony, Administrative Record, p. 101). It is an occupational hazard for police officers to encounter allegations of various improprieties in the performance of their duties, *e.g.*, police brutality, unnecessary force, sexual improprieties, discrimination claims, bribery, job performance failures, and civil rights violations. *See* n. 12 *infra*.

benefits under the PSOBA. *Greeley v. United States*, 50 F.3d 1009, 1011 (Fed.Cir.1995). Plaintiff first maintains that the Bureau's determination is inconsistent with its own regulations, citing 28 C.F.R. § 32.8. Section 32.8 deals with an officer's "[I]ntention to bring about [his] death or permanent and total disability." This section has nothing to do with the initial determination of whether or not the officer is eligible to receive benefits under the Act. Before the question of *intention* can be addressed, the question of *eligibility* for the benefit must be determined (emphasis added). Plaintiff's effort to create an inconsistency in this regard lacks merit.

■ Plaintiff seemingly recognizes this for her main argument is that "the issue of whether or not the term 'injury' under the PSOBA encompasses mental injuries can be resolved by looking to worker's compensation cases." (Pltf's Motion Br. p. 19). Plaintiff, in support of this position, relies heavily on *Russell v. Law Enforcement Assistance Administration*, 637 F.2d 1255 (9th Cir.1980), wherein the Ninth Circuit concluded that "courts should look to general [state] workers' compensation law as a guide to the development of a federal law and interpret the Benefits Act job-relatedness test consistently with workers' compensation doctrines, unless there is a significant policy reason to diverge." (637 F.2d at 1265). First, there is tension created between the court's holding in *Russell*, decided in 1980, and the Supreme Court's establishment of the *Chevron* deference analysis in 1984 in *Chevron*, 467 U.S. at 842–45, 104 S.Ct. 2778, later emphatically reaffirmed in 1999 in *Haggar Apparel Company*, 119 S.Ct. at 1394–95, 1399–1400.[10] More importantly, the Federal Circuit in

*Chacon*, 48 F.3d at 511–12, specifically held that the *Chevron* deference analysis was the proper approach when considering a party's challenge to the Bureau's interpretation of the PSOBA since it has been charged with administering the Act. Moreover, a later Ninth Circuit opinion, *Davis v. United States*, 169 F.3d 1196, 1200 (9th Cir.1999), found the Ninth Circuit lacked jurisdiction to review Bureau decisions under the PSOBA after concluding that the *Russell* court's determination that it had jurisdiction had been undermined and that "*Russell* no longer controls." While this court, in any event, would not be bound by the rationale set forth in *Russell*, the fact that the *Russell* court was later found to lack jurisdiction to rule on the matter before it certainly detracts from any precedential value the decision might otherwise have. Finally, prior decisions of the court have cautioned that there are distinctions between the PSOBA and the differing workmen's compensation statutes in the multiplicity of states. *See North*, 1 Cl.Ct. at 98, 555 F.Supp. at 387; *Tafoya v. United States*, 8 Cl.Ct. 256, 263 (1985);[11] but see *Harold v. United States*, 225 Ct.Cl. 168, 634 F.2d 547, 552 (1980), wherein the Court of Claims concluded Congress did not intend to debar benefits to public safety officers' survivors when the officer's death was caused by his own gross negligence. The *Harold* court referred to "a well accepted principle of the law of workmen's compensation" regarding line of duty determinations. Whether the *Harold* holding would survive a *Chevron* analysis today is questionable. *See Haggar*, 119 S.Ct. at 1400, wherein *Chevron* deference trumped the historical practice in custom

---

**10.** "The whole point of regulations such as these, however, is to ensure that the statute [here the PSOBA] is applied in a consistent and proper manner. Deference to an agency's expertise in construing a statutory command is not inconsistent with reaching a correct decision." *Haggar Apparel Company*, 119 S.Ct. at 1399. Reliance on the workmen's compensation laws of the 50 states would not ensure that the PSOBA is applied in a consistent and proper manner.

**11.** In *Morrow v. United States*, 227 Ct.Cl. 290, 647 F.2d 1099, 1101, n. 2 (1981), the Court of Claims cited "Commentary" [42 Fed.Reg. 23260

(1977)], wherein the Bureau's predecessor LEAA wanted "to ensure that eligibility [for the PSOBA benefits] will be determined by a uniform set of rules, regardless of where in the country the officer died or his beneficiaries reside. LEAA believes that the establishment of uniform rules and precedents best manifests congressional intent." In the Hearing Officer's determination, he notes that the workmen's compensation laws of approximately 30 states compensate for mental injuries. The reasonable conclusion to be drawn from this assertion is that approximately 20 states do not compensate for mental injuries. This observation suggests that reliance on work-

cases. In any event, the *Harold* reasoning does not dictate a different result in this case because Congressional intent is not "thwarted" by the holding in this case. Accordingly, reliance on workmen's compensation case law generally does not seem to be, at this date, a viable tool in determining eligibility for PSO-BA benefits.

Plaintiff also takes issue with the Bureau's inclusion of mental and psychological injuries within the "stress and strain" exclusionary language of the regulations. 28 C.F.R. § 32.2(g). In *Smykowski*, 647 F.2d at 1105, the court noted, and it is true in the case at bar, that "[C]laimants do not take issue with the agency's position excluding stress, strain, and heart disorders from coverage of the Act, exclusions which, in any event, are amply justified by the statutory language, legislative history [fn 6], and medical statistics [fn 7]" (footnotes 6 and 7 omitted). Plaintiff argues that Post Traumatic Stress Disorder (PTSD) and depression is "a singular, isolated, identifiable and extreme event" and is to be distinguished from the common stress and strain inherent in everyday police work.[12] Whatever appeal this argument has runs counter to the *Chevron* deference rule, discussed above relative to the Bureau's interpretation of its own regulations. Further, it seems reasonable to categorize the allegation which set in motion the stress and strain in Officer Yanco as a trying event, or an "extreme event" as plaintiff categorizes it, and not a traumatic injury. *See Smykowski*, 647 F.2d at 1105. Traumatic events, such as the allegation of sexual impropriety, are to be distinguished from traumatic injuries. Traumatic events do not themselves constitute traumatic injuries. "[H]eart attacks generally do not constitute traumatic injuries, so deaths from heart attacks do not qualify for Benefits Act benefits ...." *Russell v. United States*, 231 Ct.Cl. 1022, 1023, 1982 WL 25838 (1982).

Plaintiff has the burden of showing that the Bureau's inclusion of PTSD and depression as encompassed by the exclusionary language "stress and strain" is unreasonable under the existing circumstances. Plaintiff has not carried her burden in this regard. It must be remembered that "[T]he court need not conclude that the agency construction was the only one it permissibly could have adopted" in order for the court to accept it. *Chevron*, 467 U.S. at 843, n. 11, 104 S.Ct. 2778; *Chacon*, 48 F.3d at 512. The court "must affirm any reasonable interpretation made by administrators of [the] agency." *Chevron*, 467 U.S. at 844, 104 S.Ct. 2778; *Chacon*, 48 F.3d at 512. Finally, the court is not persuaded that the exercise of judicial deference in this case will "thwart congressional intent." *See Haggar Apparel Company*, 119 S.Ct. at 1400.

As further support for her position that post-traumatic stress disorder should be included in the definition of "personal injury" under the PSOBA, and the Bureau's failure to do so was, according to plaintiff, unreasonable, plaintiff calls the court's attention to 38 C.F.R. § 3.304(f), regulations issued by the Veterans Administration relative to pensions, bonuses, and veterans' relief. Section 3.304(f) specifically provides that post-traumatic stress disorder can serve as a basis for a pension award in determining veterans' benefits. The PSOBA, its legislative history, and implementing regulations make no reference to post-traumatic stress disorder. Plaintiff also refers to 38 U.S.C. § 1110 generally, which provides compensation to veterans for service-connected disability and death, especially the determination of benefits in suicide cases. As noted earlier, the PSOBA must be interpreted on the basis of its specific language and the specific language of its implementing regulation. *See North*, 1 Cl.Ct. at 98, 555 F.Supp. at 387. Plaintiff's argument, in this respect, would be best addressed to Congress rather than to the court. This was the admonition the Court of Claims gave the claimant in *Smy-*

men's compensation cases would not produce uniform rules and precedents.

12. In *Smykowski*, 647 F.2d at 1106, the Court of Claims cited legislative history which "identified police work as the most hazardous occupation in terms of the probability of developing stress-related problems. Present evidence indicates that more law enforcement officers are incapaci-

tated because of heart-related illness than due to any other cause." This same legislative history citation opined one senator's view "that many deaths [of public service officers] could be avoided if preventive action were taken. By preventive action, I mean assuring that these public safety officers are in good physical and mental condition." *See* n. 9, *supra*.

*kowski,* 647 F.2d at 1106, and it is equally appropriate in this case. *See also Russell,* 231 Ct.Cl. at 1025.

The court concludes that the Bureau has substantially complied with the PSOBA and implementing regulations and that it has not in any significant way misconstrued the Act or the implementing regulations. The Bureau's determination in this case has not been shown to be unreasonable or inconsistent with Congressional intent.

### - C -

Plaintiff alleges the Bureau committed procedural error in the processing of her claim. Plaintiff argues there was excessive delay between the date of the Hearing Officer's determination on December 6, 1995, and the final Bureau decision on February 14, 1997. Plaintiff first claims the procedural requirements of 28 C.F.R. § 32.24(i)2 were violated. This provision relates to a situation where a claimant is determined to be ineligible for benefits by the Hearing Officer. In the case at bar, the Hearing Officer found plaintiff eligible for benefits. Accordingly, this provision is not applicable in this case. Plaintiff next claims the procedural requirements of 28 C.F.R. § 32, Appendix to Part 32, subsection (e)3, were violated. This section has applicability to this case in that it covers the situation where "... either the PSOB Office or the OGC [Office of General Counsel] disagrees with the Hearing Officer's final determination." Subsection 3 provides, in pertinent part, "... The BJA Director shall seek to advise all parties of the final agency decision within 30 days after expiration of the comment period." A plain reading of this subsection does not mandate a 30-day period within which the Bureau must issue a decision. Plaintiff submitted her comments on September 21, 1996. The Bureau's decision was dated February 14, 1997, some 116 days (from October 21, 1996) later. There was no violation of this discretionary

implicated procedural time frame. In any event, plaintiff was not harmed procedurally or otherwise as far as her claim was concerned. Plaintiff does not specifically deny this fact. Most importantly, plaintiff's counsel was given a fair opportunity to present her claim to the Bureau. Instead, plaintiff's claim of harm is counsel's assertion that the delay in not processing plaintiff's claim more expeditiously extended the Yanco family's "torture and emotional pain and suffering of the absence of closure on Officer Yanco's death" and "[T]he torture of the extended delay has made it impossible for the Yanco family to put closure on the grief process and has had a measurable adverse impact on Mrs. Yanco's health." [13] There is no factual support for these assertions. More importantly, such assertions are not the kind of harm that supports assessment of any penalty, assuming there was a significant violation of a procedurally-mandated time requirement. Generally, assertions such as these by counsel at oral argument or in the briefs deserve little, if any, consideration. *See Pure Gold, Inc. v. Syntex (U.S.A.), Inc.,* 739 F.2d 624, 626–27 (Fed.Cir.1984); *Singleton v. United States,* 6 Cl.Ct. 156, 168 (1984).

### - D -

Having concluded that plaintiff was not eligible for benefits under the PSOBA (Inquiry (1), Part—A—of Discussion), it is really not necessary to decide two other issues (Inquiries (2) and (3), Part—A—of Discussion) which the Bureau discussed and to which the parties directed a good portion of their briefs and arguments. However, a brief discussion of those two issues might be helpful in confining the various assertions and arguments of counsel to the appropriate inquiry.

In its fourth "Conclusion of Law," the Bureau concluded that Officer Yanco was not acting in the line of duty at the time of his death. This conclusion was based on the

---

**13.** It should be borne in mind that the PSOBA was designed to serve as "a limited program" which would "balance 'compensating for inadequate state and local benefits ... [with] budgetary considerations and ... fears that federal assumption of full responsibility for compensating the families of deceased officers would weaken

the federal system and allow states and municipalities to evade their responsibility.'" *See Chacon v. United States,* 32 Fed.Cl. 684, 687 (1995). As indicated earlier, plaintiff was granted a pension by the State of Massachusetts and there is no allegation that the pension was inadequate.

view that Officer Yanco's self-inflicted gunshot wound was the traumatic injury that caused his death. The self-inflicted gunshot wound took place at Officer Yanco's home when he was off duty. The Bureau referenced section 32.2(c)(1) of the regulations which defined *Line of Duty* as "[A]ny action which an [officer] is obligated or authorized by rule, regulation, condition of employment or service, or law to perform." Officer Yanco was not obligated or authorized to shoot himself.[14] Plaintiff maintains that the self-inflicted gunshot wound was not the traumatic injury suffered in the line of duty in this case. Plaintiff insists that the false allegation by a minor male of conduct amounting to pedophilia was the traumatic injury in this case and this allegation was made when Officer Yanco was on duty. As indicated earlier, the allegation itself generally would not be sufficient to kill an officer. *See North*, 555 F.Supp. at 386. Too, Officer Yanco's refusal to seek professional help relative to his stress and depression, as urged by his wife, because he felt ashamed might be deemed a critical intervening factor that could have possibly averted the tragedy. The court need not and does not decide this issue.

In the fifth "Conclusion of Law," the Bureau concluded that Officer Yanco intended to kill himself. In this regard, the Bureau held that the Act precluded the award of benefits if the officer's death was caused "by such officer's intention to bring about his

death...." In support of this conclusion, the Bureau stated in pertinent part:

> ... The record shows that Officer Yanco logically explained his reasons for despair, his fear that his reputation was irreparably ruined, and his feeling that he could not take the pressure of the possible criminal investigation and the resulting disgrace. Officer Yanco prepared notes for his wife and son, explaining the reasons for his action, approximately two hours before his suicide. Finally, Officer Yanco then called a close associate to inform him of his plans, and where to find the notes that were left. In my view, these actions indicate a carefully thought out and methodically carried through act of suicide. I find the factual record insufficient to support the hearing officer's finding that Officer Yanco was incapable of forming the intention to take his own life. Claimant has not satisfied her burden of proof on this issue.

While plaintiff argues there was no substantial evidence in support of the Bureau's discussion of Officer Yanco's "intention," the factual matters recited by the Bureau in the above conclusion constitute, standing alone, significant evidence on the matter of intention.[15] Plaintiff's real argument on this issue is that the Bureau failed to give due consideration to the opinions of two certified psychiatrists and a forensic psychologist who conducted posthumous psychiatric evaluations (psychological autopsies) and whose conclusions caused the Hearing Officer to rule in plaintiff's favor.[16]

---

**14.** In *Harold v. United States*, 634 F.2d at 548–49, an officer's death in cleaning his weapon in a grossly negligent manner at home while off duty was deemed to be in the "line of duty" because "it was an unwritten rule of the police department that the policemen were to clean their weapons at home."

**15.** Plaintiff suggests that the Bureau really denied this claim solely because it was a suicide. The record does not support this view. While the Bureau has had to deal with few cases involving suicide, in the only case documented in the materials before the court (the suicide of a Chief of Police), the benefits claim was denied based on a suicide note and an autopsy report showing that the gun was pressed to the side of decedent's head when the fatal bullet was fired. The Bureau also rejected the view, advanced in that particular case, that pressures which emanated from his job led to his suicide, and thus warranted the payment of benefits. The Police Chief of

the Town of Wellesley in his June 1993 Report on Officer Yanco's suicide quoted from a Mental Health Association brochure entitled *Grief After Suicide* (1981) in pertinent part as follows: "Each suicide is individual, regardless of the generalizations about the 'whys,' and there may be no way you will completely understand the suicide victim's thought process."

**16.** Dr. Beck, a psychiatrist and licensed psychologist, concluded in his report that Officer Yanco's "depression was so great that it substantially interfered with his capacity to monitor and control his own suicidal impulses.... Officer Yanco lacked the mental capacity to form intent at the time he killed himself." Dr. Raymond, a psychiatrist, concluded in her report that Officer Yanco "had [an] untreated mental disease, *i.e.*, Post-Traumatic Stress Disorder and Major Depression, as well as accompanying 'ego constriction' .... He did not appreciate the wrongfulness of

Plaintiff argues that the Bureau's refusal to accept the Hearing Officer's award of benefits which rested squarely on the reports and/or testimony of the above three experts was arbitrary and capricious.[17] Indeed, that refusal, plaintiff stresses, is compounded by the Bureau's total disregard of such evidence. Since the Bureau had concluded that plaintiff was not eligible for benefits under the PSOBA, it really was not necessary for the Bureau to "gild the lilly" by advancing another basis for denial of the claim, especially if the basis for the decision was an incomplete consideration of the totality of the record evidence.

As to the merits of plaintiff's charge of arbitrary and capricious disregard of expert opinions on the matter, "[E]ven uncontradicted opinion testimony is not conclusive if it is intrinsically nonpersuasive. . . ." *Sternberger v. United States,* 185 Ct.Cl. 528, 401 F.2d 1012, 1016 (1968). However, " '[T]he substantiality of evidence must fairly take into account whatever in the record detracts from its weight.' *Universal Camera Corp. v. National Labor Relations Board,* 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 . . . (1951). . . ." *Id.,* 401 F.2d at 1016. While the Bureau has the right to reject or disregard the uncontroverted opinions of experts, it may also have an obligation to provide a reasoned explanation why it rejects or disregards such opinions. *See McClendon v. Sec-*

*retary of Department of Health and Human Services,* 23 Cl.Ct. 191, 199 (1991). To the extent the Director of the Bureau detected faults, omissions, or other errors, which generated disbelief or unpersuasiveness in the experts' opinions, she would have been better served to have voiced them in her fifth conclusion of law. *See Sternberger,* 401 F.2d at 1016–17.[18]

In any event, given the holding above that plaintiff was not eligible for PSOBA benefits, the court need not and does not rule on plaintiff's contention of arbitrary and capricious action on the part of the Bureau in the decision-making process in this case.

### Conclusion

For reasons set forth above, the court concludes that plaintiff, and her children, are not eligible for PSOBA benefits. Accordingly, defendant's motion for summary judgment is granted and plaintiff's cross-motion for summary judgment is denied. The complaint shall be dismissed. No costs.

IT IS SO ORDERED.

---

his act. He saw no alternative for himself and he wanted to relieve himself of his intense mental anguish over the allegations and potential loss of his reputation. . . ." Dr. Ebert, a forensic psychologist, concluded in his report that Officer Yanco "genuinely believed that his reputation could never recover from the allegation and so ended his life because of an incident that arose while in the conduct of his duties as a police officer for the Town of Wellesley." Plaintiff argued often and strenuously that the Hearing Officer's determination favorable to plaintiff should be accepted by the court. However, it is the determination of the Bureau Director that counts. *See, e.g., Smykowski,* 647 F.2d at 1105, n. 4; *see also Howard v. United States,* 229 Ct.Cl. 507, 508–09 (1981).

17. The "arbitrary and capricious" standard, for agency review purposes, is a highly deferential standard. Under that standard, a court is not empowered to substitute its judgment for that of the agency. *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.,*

463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). Indeed, "the central focus of the arbitrary and capricious standard is on the rationality of the agency's 'decisionmaking,' rather than its actual decision." *United States v. Garner,* 767 F.2d 104, 116 (5th Cir.1985).

18. At oral argument, defendant's counsel did attempt, in a very limited way, to find fault with the opinions of the experts arguing, for example, that Dr. Beck's testimony was inconsistent with his report on the question of intention. It should also be noted that the reports of Dr. Raymond and Dr. Ebert were initially prepared for and in support of plaintiff's pension claim filed with the Town of Wellesley and the State of Massachusetts. *See Chacon,* 32 Fed.Cl. at 687, *aff'd,* 48 F.3d 508. In Dr. Raymond's report, she relies on workmen's compensation law in support of her conclusion. Dr. Raymond's report was not directed to the PSOBA. As suggested earlier, reliance on workmen's compensation cases does not seem to be a viable tool in determining eligibility for PSOBA benefits.