**Thomas A. PORTER, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 02–453C.**

United States Court of Federal Claims.

Feb. 8, 2005.

Frederic W. Schwartz, Jr., of Washington, D.C., for plaintiff.

David D'Alessandris, United States Department of Justice, with whom were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, and Todd M. Hughes, Assistant Director, Washington, D.C., for defendant. Linda Fallowfield, Office of Justice Programs, of counsel.

*OPINION*

BRUGGINK, Judge.

This is an action brought under the Public Safety Officers' Benefits Act ("the Act"), codified at 42 U.S.C. §§ 3796–3796c (2004). That legislation is intended to provide a monetary benefit to a public safety officer who

"has become permanently and totally disabled as the direct result of a catastrophic injury suffered in the line of duty." *Id.* § 3796(b). Plaintiff claims that he received such an injury as a result of an accident connected with his work. The matter is pending on the parties' cross-motions for summary judgment pursuant to RCFC 56.1. The case was transferred to the undersigned on December 9, 2004, and has been fully briefed. Oral argument was held on January 31, 2005. For reasons set out below, we deny plaintiff's motion for summary judgment and grant defendant's motion.

## BACKGROUND [1]

Sweet Briar College is a private school in Amherst, Virginia. In July 1990, plaintiff, Mr. Thomas A. Porter, was 36 years old. At the date of the accident at issue, July 6, 1990, plaintiff was employed by the college as a campus police officer. The Chief of Police for the college, W.H. Neal, wrote the following concerning the accident:

> On July 6, 1990 at 3:43 p.m. Officer Porter, Badge # 16 was responding to a call about kids jumping off the porch of the Sweet Briar College's Boathouse, not a Breaking and Entering call. On July 6, 1990 at 3:52 p.m. Officer Porter radioed the Sweet Briar College dispatcher to have me ... respond to his location because he was involved in a head on collision and to bring ice.... Thomas A. Porter transported himself to Lynchburg General Hospital. The Doctor's record indicates that Thomas A. Porter sustained a sprained thumb ...."

Administrative Record ("A.R.") 149. A police report concerning the accident reflects an estimate of $2000 damage to the vehicle Porter was driving. The report reflects that the other vehicle sustained an estimated $300 in damage. Plaintiff contends that he was "permanently and totally disabled" within the meaning of the Act as a result of the accident.

Chief Neal also wrote the following concerning the nature of plaintiff's employment: "each law enforcement officer for the college in 1990 was sworn as a special police officer under Virginia Code Section 15.1–144. We are private police officers for a private institution. Our organization is not a public safety agency, although we function in the same manner." A.R. 149.

During the evidentiary hearing below, plaintiff testified that he suffered a "broken back, broken right hand, my foot was messed up. I had internal bleeding." A.R. 93. Despite these apparently extensive injuries, he was only offered a bag of ice for his hand. Three hours later, after taking photographs, he left the scene of the accident under his own power and drove forty-five minutes to a hospital in nearby Lynchburg, Virginia.

The admission report at the hospital reflects the injury as "pain right hand and back." A.R. 55. Mr. Porter was ambulatory when admitted and was awake and alert.[2] There is no reflection anywhere in the hospital report of a broken back, injury to his feet, or internal bleeding. Two other hospital reports, for August 25 and September 6, 1990, were similar. They reflect back pain and an inability by Mr. Porter to bend his thumb.

Mr. Porter visited Dr. James E. Foster on July 20, 1990. Dr. Foster prescribed "no work for at least two weeks." A.R. 152. Two weeks later plaintiff visited Dr. Foster's partner, Dr. William E. Frank, Jr., who diagnosed "sprain[ed] ulna collateral ligament R thumb." A.R. 153. Dr. Frank also directed no work for an additional two weeks. On August 22, a third visit yielded a similar sprain diagnosis and a direction for no work "until at least 9–17–90." A.R. 154.

In connection with an application for Virginia workman's compensation benefits, Mr. Porter was examined by Dr. Timothy B. Short, who practices in Earleysville, Virginia. Dr. Short "expect[ed] that all of these prob-

---

1. The facts are drawn from the Administrative Record developed below.

2. Dr. Ammerman, his physician, records in notes dated March 22, 1991, that "[h]e did not strike his head and there was no loss of conscious-

ness." A.R. 132. In his testimony, on the contrary, Mr. Porter suggests that he was unconscious when admitted: "And when I got to the hospital, the next thing I remember was coming to later." A.R. 93.

lems should resolve without any long term disability." A.R. 155. Dr. Short referred Mr. Porter to an orthopedic specialist in Charlottesville, Virginia, Dr. John H. Post, III. Dr. Post reported:

> With respect to his right hand he was apparently noted to have a sprained ulnar collateral ligament of the thumb which was casted and ultimately referred to physical therapy. X-rays showed no fracture or dislocation. He reports that he had no history of previous problems and that the thumb was coming along nicely, however, "I don't have the control I need of my right hand" and apparently is not yet back to work in any capacity. The reason for this is not at all clear. "I'll know when I am ready."

A.R. 162. Dr. Post then reported that the results for other neurological tests and for an examination of Mr. Porter's back were normal. After considering the objective data, Dr. Post went on to report the following:

> In short, I am not able to explain the patient's physical findings with reference to his subjective complaints. He is over 3 months out from this accident and although I don't know his situation, I would be concerned with some type of secondary gain. This is especially true regarding his hand where, it would seem that the administrative duties of a campus police officer could easily be performed by Mr. Porter.

A.R. 163.

The Virginia Workers Compensation Commission awarded plaintiff compensation beginning on July 14, 1990, and approved a lump sum payment of $25,000. On March 22, 1991, he was seen by Dr. Bruce Ammerman, who noted that Mr. Porter complained of persistent lower back pain and that "[h]e continues to have some difficulty with his right hand." A.R. 132. Dr. Ammerman noted, however, that Mr. Porter "walks with an unremarkable gait." *Id.*

Dr. Ammerman apparently referred Mr. Porter to Dr. Edward R. Laws, Jr., at the Spine Center operated by George Washington University Medical Center. Dr. Laws wrote a report after examining plaintiff in which he emphasized that surgery was not warranted. He noted that plaintiff indicated much pain in the lower back but that his range of motion was "remarkably self restricted." A.R. 52.

Mr. Porter continued to have problems with low back pain and sciatica-like symptoms. In 1991, he was diagnosed with a nondisplaced fracture of the body of lumbar vertebra three. He was medically retired from the Sweet Briar College Campus Police Department as of November 30, 1991. On February 24, 1996, he had a laminectomy. He was also treated at the time for stress disorder and depression.

Prior to his laminectomy, plaintiff was evaluated by a psychologist at the request of the Commonwealth of Virginia's Department of Rehabilitative Services. Mr. Patrick Lockhart reported that "Thomas is currently severely physically and emotionally disabled and does not appear capable of engaging in gainful employment."[3] A.R. 29.

After a 1999 examination, Dr. Ammerman reported that Mr. Porter was improved somewhat after the operation, but that he continued to have residual chronic pain and discomfort in his lower back. Dr. Ammerman disagreed with Dr. Post's assessment that Mr. Porter's residual sciatica could be treated by physical therapy. In an evaluation dated February 23, 2000, he wrote that Mr. Porter "continues to be permanently disabled." A.R. 126.

In September 1998, Mr. Porter contacted the Bureau of Justice Assistance ("Bureau") to inquire about benefits under the act. He was notified of the administrative requirements, which commence with a process known as Prerequisite Disability Certification ("PDC").[4] Mr. Porter was told that he

---

3. We note that the psychological evaluation upon which this finding was based indicates that the final conclusion of disability was supported by Mr. Porter's unique circumstances, including stress and the fact that he lived in a rural area with few employment opportunities.

4. The applicable regulations set out the elements of a PDC:

> (p) Prerequisite disability certification means:
> (1)(i) The employing agency's official, certified award to the claimant public safety officer of its maximum disability finding and

had to obtain a statement from the Sweet Briar Campus Police Department concerning the circumstances of his injury, as well as an affidavit from the department's benefits provider attesting that he was receiving the maximum allowable disability compensation and that Mr. Porter was permanently and totally disabled. Although Mr. Porter was ultimately unable to obtain these documents to the satisfaction of the Bureau, the Bureau waived those normal steps and allowed Mr. Porter to proceed with his claim.

In February 2000, his case was referred for evaluation of his residual functional capacity to Howard University Hospital. His record was examined by Dr. Richard E. Grant. Dr. Grant wrote the following on February 8, 2000:

> The motor vehicle accident which occurred on [July 6, 1990,] is directly responsible for the officer's right fracture, the injury to his lower back, subsequent left lower extremity numbness, his diagnosis of post traumatic stress syndrome and the requirement for surgical intervention in the form of a partial hemilaminectomy of right L4–5with excision of herniated nucleus pulposus at Sibley Hospital on 2/24/96.

A.R. 62. Despite Mr. Porter's history of pain and various treatments, Dr. Grant concluded:

> It is my medical opinion that there is no basis to assume that Mr. Porter's residual functional capacity would prevent him permanently from performing any gainful work as defined in [28] C.F.R. 32.2(q).... In addition, the record ... indicates only moderately incapacitating diagnosis of lumbosacral strain, sciatica and post traumatic stress disorder in addition to active depression. Certainly the residual sciatica could be addressed by continued physical therapy.... [P]atients who have undergone hemilaminectomies ... [u]sually are able to return to work in some shape, form

or fashion and contribute to maintaining themselves financially.

A.R. 64.

Shortly after Dr. Grant's evaluation, Dr. Ammerman wrote a "Follow–Up Note," in which he characterized Mr. Porter's condition as "unchanged" and that "[h]e continues to be permanently disabled." A.R. 126. He nevertheless hoped that Mr. Porter would be able to obtain a wheelchair for mobility, "as he has difficulty walking short distances." *Id.*

The Bureau denied Mr. Porter's claim on February 29, 2000. He appealed the decision and the case was assigned to Hearing Officer Donald Anderson. Testimony was heard on July 31, 2000, from plaintiff, from Dr. Bruce Ammerman, Mr. Porter's treating physician, and from Mr. Keith Cox, Mr. Porter's caregiver. Dr. Ammerman testified that he had treated plaintiff since 1991 and had seen him thirty or more times. He reported that Mr. Porter had a bulging disk at lumbar vertebrae four and five and a "transcutaneous nerve stimulator, a TENS unit," A.R. 99, although a myelogram and a CATSCAN did not show anything that required surgery. He treated Mr. Porter with a variety of medications for pain and anxiety. He explained Mr. Porter's hemilaminectomy in 1996 as a means to reduce pressure at the lumbar vertebrae. His overall diagnosis was symptomatic back pain and leg pain, as well as post-traumatic stress disorder.

Hearing Officer Anderson requested a second opinion from the staff at Howard University, to be based only on review of the written record. Dr. Terry L. Thompson provided the opinion. After reviewing the file, he wrote on October 25, 2000, that:

> Mr. Porter's injuries and residuals have left him with chronic back and leg pain which would certainly prevent him from resuming his occupation as a police officer. However, I see no indication from the

---

compensation, including the officer's permanent and complete separation from the employing public safety agency as the direct result of an injury sustained in the line of duty; or
(ii) If the employing agency does not itself make such disability awards, then an official, certified award to the claimant public safety

officer by the cognizant judicial, political or administrative agency or body of its maximum disability finding and compensation, including the officer's permanent and complete separation from the employing public safety agency as the direct result of an injury sustained in the line of duty.
28 C.F.R. § 32.2(p).

medical record that ... Mr. Porter is incapable of some form of work even at a sedentary level.... Dr Ammerman ... suggested that Mr. Porter was incapable of resuming his previous occupation as a police officer, however, he did not indicate that Mr. Porter was not [ ]capable of any form of gainful employment.... [A]ll indications suggest the he is capable of some form of gainful employment, even at a sedentary level.

A.R. 141.

Thereafter, Dr. Ammerman wrote Mr. Porter's attorney. His report, dated April 25, 2001, reflects that:

Mr. Porter, unfortunately, is permanently and totally disabled due to his intractable low back pain with sciatica, recurrent spasms, and markedly reduced ambulation.

I do not believe the patient is capable of sitting for more than 1–2 hours per day. Walking more than going to the restroom is difficult for him. He has been advised not to bend, lift, squat, climb, kneel, or twist.

Unfortunately, although Mr. Porter has now obtained an electric wheel chair to promote his mobility, he continues to have severe back pain requiring sedative medication, which also interferes with his cognitive ability. The patient is therefore disabled, even from sedentary work, while in the seated or wheel chair position.

A.R. 175.

After receiving further information from Sweet Briar College concerning plaintiff's status, the Hearing Officer issued an opinion on July 12, 2001, upholding the Bureau's denial of benefits. He concluded that Mr. Porter was ineligible for two reasons: first, because he was not a "public safety officer" within the meaning of the Act, and, second, because Mr. Porter's condition did not meet the statutory test of a permanent and total disability from work. The Hearing Officer also made it clear that he questioned the reliability of Mr. Porter's statements. Mr. Porter appealed to the Director of the Bureau, Mr. Richard R. Nedelkoff. On April 1, 2002, the Director issued the agency's final decision, upholding the Hearing Officer's determination and denying relief. He did not ground his decision on the alternative basis that Mr. Porter was not a public safety officer. He based it solely on the merits. Plaintiff brought the present action on May 1, 2002.

## DISCUSSION

For the reasons set out below, we conclude that the Bureau's decision warrants affirmance. We therefore deem it unnecessary to address the government's alternative argument that Mr. Porter was not a public safety officer within the meaning of the Act.[5]

The Act is administered by the Bureau, which is required, in the event of a claim arising out of an injury, to make the determination of whether a "public safety officer has become permanently and totally disabled as the direct result of a catastrophic injury suffered in the line of duty." 42 U.S.C. § 3796(b). The Bureau is also delegated the task of developing regulations to implement the legislation. These are codified at 28 C.F.R. pt. 32.

Our review, pursuant to RCFC 56.1, is based on the administrative record. It is not *de novo*. Our limited mandate is to determine whether the denial of benefits by the Bureau is in substantial compliance with the statute and implementing regulations; whether the Bureau acted in a way that was arbitrary or capricious; and whether there was substantial evidence supporting the denial. *See Chacon v. United States,* 48 F.3d 508, 511 (Fed.Cir.1995); *Morrow v. United States,* 227 Ct.Cl. 290, 296, 647 F.2d 1099, 1102 (1981); *Davis v. United States,* 50 Fed. Cl. 192, 196 (2001).

Plaintiff does not contend that the Bureau committed prejudicial procedural violations

---

5.   Under Virginia law applicable at the time, Mr. Porter could be, and was, deputized by Amherst County to act under its direction on the campus. *See* Va.Code Ann. § 15.1–144 (Michie 1990) (current version at Va.Code Ann. § 15.2–1737 (Michie 2004)). Under the Act, a public safety offi-cer is "an individual serving a public agency in an official capacity ... as a law enforcement officer." 42 U.S.C. § 3796b(8). Sweet Briar College is not a public agency, and it is not clear that the deputization was for any purpose other than the convenience of the college.

or acted in an arbitrary or capricious manner. Nor does he contend that the Bureau violated the law, at least with respect to the decision on the merits. Our only inquiry, therefore, is whether there is substantial evidence to support the Bureau's denial of relief.

The question posed to the Hearing Officer, insofar as relevant here, was whether Mr. Porter was permanently and totally disabled as the direct result of a catastrophic injury. The applicable regulations furnish interpretative definitions:

> (f) Catastrophic injury means consequences of an injury that permanently prevent an individual from performing any gainful work.
>
> . . . .
>
> (h) Permanent and total disability means medically determinable consequences of a catastrophic, line-of-duty injury that permanently prevent a former public safety officer from performing any gainful work.

28 C.F.R. § 32.2.

Residual functional capacity is defined in the regulations as

> that which a former public safety officer can still do despite limitations imposed by a disability. Residual functional capacity is a medical assessment, a determination to be made by the Office's medical experts. Such medical determination will be based on examination of prerequisite disability certifications as specified in 28 CFR 32.2(p), and by examination of any additional case specific medical and other relevant documentation necessary to a medical assessment and determination of residual functional capacity.

28 C.F.R. § 32.2(r).

The Hearing Officer was confronted with conflicting evidence. Dr. Ammerman concluded that plaintiff is totally incapable of any gainful employment. Yet there are numerous reports in the record indicating that, over the course of the decade after the injury, Mr. Porter has been able to walk, swim, exercise, write letters, and argue the merits of his case. In addition, the Hearing Officer had the evaluations of two doctors who concluded without equivocation that Mr. Porter was not permanently and totally disabled. Dr. Grant reported that "there is no basis to assume that Mr. Porter's residual functional capacity would prevent him permanently from performing any gainful work." A.R. 64. He also was "convinced that Police Officer Thomas Porter would be well served by developing a program that would allow him to return to gainful employment." *Id.* While Dr. Grant may not have reviewed the record after Dr. Ammerman's latest indication of total disability, Dr. Thompson reviewed the entire record, including Dr. Ammerman's testimony at the hearing. He reported that he saw "no indication from the medical record that would suggest that Mr. Porter is incapable of some form of work even at a sedentary level." A.R. 141. Hearing Officer Anderson and Director Nedelkof carefully examined the evidence and concluded that the evaluations of Drs. Thompson and Grant were more persuasive.

Plaintiff's primary argument is that the Hearing Officer gave undue weight to the reports of Drs. Thompson and Grant and improperly discounted Dr. Ammerman's testimony and analysis. It bears emphasis that it is not within the court's purview to reweigh the evidence. The sole question is whether the evaluations of Drs. Thompson and Grant can constitute substantial evidence. Plainly they can. While plaintiff may prefer Dr. Ammerman's conclusions, the observation that they are squarely at odds with those of two other orthopedic doctors is unavoidable. The Hearing Officer, moreover, saw Mr. Porter in person at the 2001 hearing. He was in a position, therefore, to assess not only his physical abilities, but also Mr. Porter's ability to reason and argue, as well as his credibility.

It is true, as plaintiff points out, that Dr. Ammerman's most comprehensive statement of disability came on April 25, 2001, after the hearing, and after Dr. Grant and Dr. Thompson had reviewed the file. This final assessment would not appear to leave room for any residual capacity because Mr. Porter was, in Dr. Ammerman's view, "totally disabled." A.R. 176. Unlike plaintiff, however, we do not view this one statement as a reason to completely discount the prior assessments of

the other two doctors. First, Dr. Ammerman had made much the same assessment in February, 2000, prior to Dr. Thompson's review. Moreover there is nothing in Dr. Ammerman's April 25 recitation that explains, based on any new physical developments in Mr. Porter's condition, why Mr. Porter is now completely disabled from any gainful activity. Finally, the letter goes on to refer to *limited* abilities to sit or walk, as opposed to a complete inability. It also indicates that he is able to use a wheelchair. Although it is true that Dr. Ammerman stated Mr. Porter was "disabled, even from sedentary work" in the wheelchair because his use of sedatives "interferes with his cognitive ability," the Hearing Officer was entitled, having seen Mr. Porter in person, and in light of the assessments of Drs. Thompson and Grant, to give less than conclusive weight to this assessment.

We also note that Mr. Porter's disability is frequently linked in the record to a diagnosis of "post-traumatic stress syndrome." Presumably this is the reason the Hearing Officer noted in his opinion that the definition of traumatic injury in the regulations excludes "stress and strain." *See* 28 C.F.R. § 32.2(g).[6] It is apparent in many of the evaluations that other persons would not be as incapacitated as Mr. Porter by the objectively verifiable injuries. Dr. Edward Laws noted that Mr. Porter's range of movement was "markedly self restricted." A.R. 17. Dr. Grant reported that "[u]sually these individuals are able to return to work in some shape, form or fashion and contribute to maintaining themselves financially." A.R. 64. Dr. Post noted, "I am unable to explain the patient's physical findings with reference to his subjective complaints." A.R. 163. And Dr. Ammerman himself stated during the hearing, "based on my three to four thousand operations of this sort ... Mr. Porter, unfortunately, has been one of the least successful as far [as] his overall course .... When I put that together with his psy-

chological challenges, I think it is absolutely unrealistic [to think he could work]." A.R. 104–05. There was a rational basis, therefore, for the Hearing Officer to conclude that Mr. Porter's asserted incapacity was not due to a qualifying injury, but may have been due to psychological or stress-related factors.

Finally, we note that the Hearing Officer and the Director had misgivings about the reliability of Mr. Porter's statements about his condition. A review of the record indicates that these misgivings had evidentiary support. Mr. Porter's testimony during the Bureau hearing, for example, reveals a number of questionable statements. The following colloquy took place between the Hearing Officer, Thomas Anderson, and plaintiff:

Anderson: Who was your employer?

Porter: Sweetbriar Police Department, Sweetbriar, Virginia.

Anderson: Is that a public safety agency?

Porter: Yes, it is.

Anderson: It has nothing to do with the college campus police?

Porter: No, it is under the Amherst County Circuit Court.

A.R. 90. Porter's final statement is obviously incorrect. Moreover, Porter testified that the accident was precipitated by his responding to a "breaking and entering a business." A.R. 91. Nothing in the record supports that statement.[7] He also testified that he was hit by someone going "50 miles an hour." A.R. 92. The accident report, by contrast, reflects that the other driver was traveling at 23 miles per hour. Mr. Porter testified that he called campus police dispatch with the following unnecessarily alarming report: " 'Officer down.' I said, 'I've been hit.' "[8] *Id.* We note also that Dr. Richard E. Grant, who examined him, reports that Mr. Porter told him that he "was run over by a vehicle." A.R. 62. Nothing else in the record supports that claim.

---

**6.** This regulation was endorsed in *Yanco v. United States* as a reasonable interpretation of the Act's definition of traumatic injury. 45 Fed.Cl. 782, 790 (2000).

**7.** Plaintiff's response brief suggests that his version of the dispatch is supported by the Dispatch

Log. To the contrary, the log merely refers to "kids jumping off the porch." A.R. 150.

**8.** This contrasts with the dispatch log, which reflects that plaintiff requested that someone "[b]ring ice for my hand." A.R. 150.

This dissembling appears elsewhere in the record. Among the materials plaintiff submitted to the Hearing Officer were laudatory comments from Rep. Joseph P. Kennedy, submitted into the Congressional Record. Rep. Kennedy reports the following concerning Mr. Porter:

Officer Porter's law-enforcement career came to a tragic and premature close in 1992. While confronting a suspect in a breaking-and-entering investigation, he was run over by the suspect's vehicle and suffered spinal cord injuries and several broken bones. He was paralyzed for almost two years but through rehabilitation has been able to regain partial mobility. Throughout his period of convalescence, Officer Porter has served as an inspiration to fellow disabled officers.

A.R. 184. This encomium is incorrect in at least five and perhaps six particulars. Mr. Porter was not responding to a breaking-and-entering. He did not confront the suspect. He was not run over. He did not suffer several broken bones, and he was not paralyzed. Mr. Porter may have suffered a herniated disk. Presumably Mr. Porter furnished Rep. Kennedy with this information; in any event Mr. Porter endorsed it by including it in his request for relief under the Act. A string of such statements eventually lead to his receipt of the designation of Honorary Citizen by Walt Disney World. The Bureau therefore had grounds to question the extent of his injuries, particularly as Dr. Ammerman had to rely in part on Mr. Porter's own description of his abilities and of the extent to which he was in pain.

Plaintiff asks us to "resolve any reasonable doubt arising from the circumstances of the officer's death or permanent and total disability in favor of payment of the death or disability benefit," citing the admonition of 28 C.F.R. § 32.4. We view this provision as not applicable to the question at issue here. There are no doubts as to the "circumstances" of plaintiff's alleged total disability. The government is not challenging, for example, whether plaintiff was injured in the line of duty. Nor is it suggesting that plaintiff was responsible in any way for the accident. The only relevant issue is whether plaintiff was totally disabled. Our reading of the statute and regulations suggests that this determination is not subject to the same admonition. In fact, the wording of the statute emphasizes the uniqueness of entitlement: "direct result," "catastrophic injury," and "permanently and totally disabled." *See* 42 U.S.C. § 3796(b). Moreover, total payments to all eligible claimants are limited by the annual appropriation. To the extent that insufficient funds are appropriated to cover awards, the awards are proportionately reduced, *see id.*, underscoring the need for the Bureau to be fully satisfied that the applicant meets the statutory standard.

## CONCLUSION

We conclude that the record before the Bureau provides substantial evidence to support its decision to deny relief under the Act. There is no allegation of procedural or legal error and no suggestion of arbitrary or capricious conduct. Defendant's motion for summary judgment is therefore granted. Plaintiff's motion for summary judgment is denied. The decision of the Bureau to deny relief is therefore affirmed. The Clerk is directed to dismiss the complaint. No costs.